## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **RIVER TERRACE ESTATES, INC.** | ) | **Case No. 14-11829** |
| | ) | **Chapter 11** |
| Debtor. | ) | **Judge Robert E. Grant** |

## AFFIDAVIT AND STATEMENT OF DAVID STEWART IN SUPPORT
## OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

STATE OF: Tennessee
COUNTY OF: Williamson

I, David Stewart, hereby declare as follows:

1.      I am the Chief Executive Officer of River Terrace Estates, Inc., an Indiana nonprofit corporation (the "Debtor" or "RTE"), filing for chapter 11 bankruptcy protection.  I have held this position since October 2008.  I am familiar with the business, operating history and affairs of RTE.

2.      In total, I have worked in the senior services industry for 21 years, including 14 years at the executive management level.  I hold a Bachelor of Arts Degree in Accounting from the University of Memphis.

3.      I submit this affidavit (the "Affidavit") in support of the Debtor's petition for relief filed on the date herein (the "Petition Date") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and requests for other relief, in the form of motions, that the Debtor has filed with this Court (collectively, the "First Day Pleadings").  I believe that the relief sought in the First Day Pleadings will:  (a) enable the Debtor to operate in chapter 11 with minimum disruption; (b) protect the Debtor's estate from

loss of value; (c) constitute a critical element in achieving a successful reorganization of the Debtor; and (d) benefit the Debtor's estate, residents and creditors.

4.      Except as otherwise provided herein, all of the facts set forth in this Affidavit are based on my personal knowledge, upon information supplied to me by others involved with the Debtor's business, upon my review of relevant documents, and/or based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.      The Debtor commenced the chapter 11 case to effectuate the proposed debt restructuring as set forth under the Plan (as defined below). Contemporaneously herewith, the Debtor has filed the Plan and accompanying disclosure statement (the "Disclosure Statement"). The Debtor intends for its senior living community to emerge from chapter 11 with a viable and healthy capital structure and well-poised for the successful growth.

6.      This Affidavit describes the business of the Debtor, explains the circumstances surrounding the commencement of the Debtor's chapter 11 case, describes the key components of the Debtor's plan of reorganization filed on the Petition Date, and summarizes the First Day Pleadings.

## I.      THE DEBTOR'S BUSINESS, CAPITAL STRUCTURE AND CIRCUMSTANCES LEADING TO THE FILING

### A.  The Debtor's Business

#### (1) Formation and Organization

7.      RTE is a public benefit corporation under the Indiana Nonprofit Corporation Act that is exempt from federal income taxation under Section 501(a) of the Internal Revenue Code. RTE is operated exclusively for charitable, scientific, and educational purposes as a 501(c)(3)

organization under the Internal Revenue Code. There are no equity interests in RTE because RTE is a non-member nonprofit corporation.

8.    RTE was originally formed in 1971 under the name Caylor-Nickel Medical Center, Inc., and at that time owned a hospital.  RTE sold its hospital in 1999, and afterward changed its name to RTE.  The River Terrace Estates continuing care and retirement community (the "Community") was built beginning in 2001 and opened for business in 2003.   The Community was built using the proceeds of municipal bonds (the "Series 2001 Bonds") issued by the City of Bluffton, Indiana, and by a $5.7 million equity contribution remaining from the sale of RTE's hospital.

9.    RTE is governed by a five-member Board of Directors consisting of the following individuals:  Michael Rosen, Chairman, Fred Brown, Secretary, Felix Fraraccio, Paul Sanders and Sherry Wheaton.

10.    Daily operations of RTE are under the direction of Nicole Melching, the Executive Director (the "ED") who reports directly to me, as CEO of RTE.  The ED is aided by our third party independent manager Greystone Management Services, Inc. ("Greystone" or the "Manager").  On information and belief, Greystone is a wholly owned subsidiary of Greystone Communities Incorporated ("GCI"), which is a Texas corporation formed in 1989 to provide development, consulting, and management services to the senior living industry.   An affiliate of Greystone is also one of the original developers of the Community.

### (2) The Community – Employees and Residents

11.    RTE owns and operates the Community, which is located on approximately 38 acres in Bluffton, Indiana.  The Community consists of a senior living community that includes 44 independent living apartments, 8 independent living cottages, 55 assisted living units that

include 14 units dedicated to residents with cognitive impairments, 30 skilled nursing beds, and common areas in one- to three-story buildings.

12.    In addition to the residences and units, the Community includes a number of amenities and recreational spaces for its residents.  These include a wellness center, gift shop, bistro, beauty salon, therapy department, chapel, four resident dining rooms and one private dining room (for special occasions and family events), library, putting green, walking trails, and transportation to activities and medical appointments.

13.    The Community also includes 2 residences at the front which were originally design show models for the Community, and which are rented independently of the Community, and the occupants of which do not participate in the Community or its amenities.

14.    RTE employs approximately 73 full-time and 77 part-time employees and also employs various independent contractors.  The employees and independent contractors provide a wide range of services including, but not limited to, (i) direct nursing and nursing assistant care, (ii) transportation and activities, (iii) social services, and (iv) dining and meal services.

15.    RTE is a co-employer along with Merit Resources, Inc. ("Merit") pursuant to an agreement between RTE and Merit dated January 10, 2003 (the "Merit Client Agreement"). Pursuant to the Merit Client Agreement, RTE is the worksite employer and Merit is the administrative employer.  Pursuant to the Merit Client Agreement, Merit is responsible for all payroll matters, payment and filing reports for all payroll taxes, maintenance of employee personnel records, payment of applicable insurance premiums, 401K fiduciary requirements, and maintenance of worker compensation insurance. RTE intends to assume the agreement with Merit.

16.     RTE also has a Shared Services Agreement with Continuums Management Services, LLC, pursuant to which the Community shares in the costs of certain accounting and administrative services including a portion of my salary.  Amounts under the Shared Services Agreement are paid by the River Terrace Estates Foundation, Inc. (discussed further below) in support of RTE, and are not paid from assets of RTE.

17.     Currently, the Community has approximately 120 residents, all of whom are senior citizens. As a continuing care retirement facility ("CCRC"), RTE offers residents the opportunity to "age-in-place," so that they can begin their time at the Community in independent living units, and as their needs increase, they can transition into assisted living or skilled nursing without having to leave the campus and the community of fellow residents and caregivers.

18.     To live at the Community, residents are required to enter into a residency agreement (a "Residency Agreement").  Pursuant to each Residency Agreement, RTE agrees to provide the following services: (i) access to an unfurnished apartment, (ii) monthly housekeeping, and (iii) dining services and other supportive services.  As more fully described herein below, the Debtor seeks to assume and honor all Residency Agreements.

19.     RTE has operated under the traditional CCRC "entrance fee" model, in which independent living residents pay entrance fees (that range from $54,000 to $110,000) upon move-in to the Community, with part of the fee being refundable after the resident leaves the Community and the unit is re-sold.  RTE is current on all of its entrance fee refunds, and there are no refunds owed at this time, although some may be owed upon the re-occupancy of certain units in the future.   RTE's total contingent liability for entrance fee refunds likely to be due over the next 7 to 8 years is approximately $1,908,450.00. (I note that based on GAAP accounting requirements related to the delayed recognition of income for entrance fees, the books for RTE

show approximately $3.5 million owed for entrance fees, but the actual total cash liability is approximately $1,908,450.00).

20.    Beginning in or around October 2013, RTE established an escrow account at PNC Bank for resident entrance fee deposits for future residents, and RTE is holding resident entrance fee deposits received since that time in escrow pending resolution of its restructuring.  The total amount of that escrow is approximately $268,658 as of May 1, 2014, related to contracts on four (4) units.  As of the Petition Date, RTE also has two move-in deposits which it has received, one for a proposed resident in its independent living in the amount of approximately $2,400 (10% of the Community Fee being paid by the resident), and another for approximately $300 from a proposed resident to reserve a unit in assisted living.

21.    Further, RTE has a bank account at PNC Bank that holds Resident Trust Funds, consisting of amounts deposited by residents and their families for discretionary use at the Community, and into which, pursuant to Indiana law, social security checks of certain residents are deposited and used to pay their monthly service fees, with the difference being available to them for discretionary cash.

22.    As of the Petition Date, RTE believes that it was also holding small amounts of sales and other taxes due to governmental units, less than $5,000 in the aggregate.

### (3) Recent History

23.    Like many CCRC's in the 2000's, the Community struggled financially. RTE began looking for a new organization to take over operations due to its financial difficulties.  In October 2008 in the midst of The Great Recession, RTE brought on new board members and its current management team, who hoped to effectuate a turnaround of the Community.

24.     Since that time, RTE has made progress but has been unable to achieve a complete turnaround in light of size of its Obligations on the Series 2001 Bonds.  Wells County, Indiana and the surrounding area are sparsely populated, and the result has been that RTE is limited in the rates it can charge.  In addition, the Community has never maintained full occupancy.  In an effort to improve occupancy, RTE in the last year has converted from an "entrance fee" to a rental model with a nonrefundable community fee, so that new residents pay a community fee of approximately $25,000 upon moving in the community.  The community fee is not refundable, so that over time (about seven-to-eight years for the full transition to occur), RTE will satisfy all of is refund obligations to residents and will no longer owe refunds in the future.

25.     For month ending June 30, 2014, occupancy for independent living units ("ILU") was at 69% (36/52), occupancy for assisted living units ("ALU") was 77% (31/41), occupancy for memory support units ("MSU") was 99%  (13.8/14) and occupancy for skilled nursing beds ("SN") was 94% (28.3/30).

26.     As of December 31, 2013 RTE's revenue was approximately $5,801,568, and $5,221,524 in operating expenses.

## B.  Capital Structure

### (1) Bonds

27.     As discussed above, the construction of the Community was funded in part by the issuance of certain 2001 City of Bluffton, Indiana Revenue Bonds in the original principal amount of $15,985,000.  The Series 2001 Bonds consist of the (i) $9,795,000 in Series 2001A fixed rate bonds with an average interest rate of 6.67% and final maturity in 2027, (ii) $3,490,000 in Series 2001B-1 EXTRAS with an interest rate of 7.00% beginning May 15, 2014

and ending May 14, 2015 and a final maturity in 2031 and (iii) $2,700,000 in Series 2001 B-2 EXTRAS with an interest rate of 7.00% beginning in May 15, 2014 and ending May 14, 2015 and a final maturity in 2032.

28.     The Series 2001 Bonds were issued and secured under the Bond Trust Indenture dated as of December 15, 2001 (the "Trust Indenture") between the City of Bluffton, Indiana ("Issuer") and The Bank of New York Mellon Trust Company, N.A., as successor to Bank One Trust Company, National Association, as trustee (the "Indenture Trustee").  The Series 2001 Bonds are pass-through municipal financing, so that all obligations owed to the bondholders are due from the Debtor, and are non-recourse to the Issuer.  The Series 2001 Bonds are further evidenced in a Loan Agreement (the "Loan Agreement") and Master Notes corresponding to each series of Series 2001 Bonds (respectively, the "Series 2001A Master Note", the "Series 2001B-1 Master Note" and the "Series 2001B-2 Master Note" and collectively, the "Master Notes"), pursuant to the Master Trust Indenture dated as of December 15, 2001, as supplemented and amended (the "Master Indenture") between the Debtor, the Issuer as applicable, and the Indenture Trustee.  Collectively, all of the documents evidencing the Series 2001 Bonds, including the Trust Indenture, the Loan Agreement, the Master Notes, the Master Indenture, all mortgages, security agreements, and other related documents, are referred to as the "Bond Documents".

29.     The proceeds of the Series 2001 Bonds were loaned to RTE to (i) finance the acquisition, construction, installation and equipping of the Community, (ii) fund a debt service reserve fund to secure the payment of principal of and interest on the Series 2001 Bonds, (iii) pay a portion of interest on the Series 2001 Bonds during the construction of the Project and (iv) pay a portion of the costs of issuance of the Series 2001 Bonds.

30.     Currently, the obligations owed under the Series 2001 Bonds are approximately $14,000,000.00 in remaining principal amount, plus pre-petition interest (the "Obligations"). All Obligations under the Series 2001 Bonds are believed to be secured equally and ratably by a mortgage lien on and security interest in substantially all real and personal property of the Debtor, including without limitation, the Community. The alleged liens and security interests asserted by the Indenture Trustee against RTE's pre-petition assets (the "Series 2001 Bond Collateral") are referred to as the "Series 2001 Bond Pre-Petition Liens".

31.     RTE may have as many as three (3) additional secured creditors or leasing creditors.  UCC-1's are filed by Webbank relating to RTE's computer systems (which UCC-1's RTE believes are filed in error) and by US Bank Equipment Finance (for notice purposes only) related to the lease of 3 copy machines.  Further, Stearns Bank is believed to have a vehicle lien on the title of one of the vans operated by the Community.  RTE is not aware of any additional pre-petition liens.

### (iii) Foundation

32.     RTE has two affiliates, the River Terrace Estates Foundation, Inc. (the "Foundation"), and the Alzheimer's Disease Foundation, Inc. ("ADF").  Both are single member Indiana nonprofit corporations, and the nominal membership interests of RTE in those entities are not property of the bankruptcy estate as both are public benefit corporations.

33.     Prior to the Petition Date, RTE received funds from time to time in the form of unsecured loans from the Foundation.  The total obligation to the Foundation for those loans as of the Petition Date is approximately $5.5 Million.

34.     The Foundation is an Indiana nonprofit corporation and its purpose is (i) to support and encourage health care services by providing beneficial support and assistance,

directly or indirectly, to Debtor, (ii) to support the healthcare-related needs of the Bluffton/Wells County, Indiana community and the service area of the Bluffton Health System LLC d/b/a Bluffton Regional Medical Center, and (iii) to engage in any activities necessary, desirable or helpful for the furtherance of such purposes.

35.     RTE and the Foundation have negotiated for debtor-in-possession financing to be provided by the Foundation, and RTE intends to seek court approval of that financing (the "DIP Financing").  The DIP Financing is necessary to fund RTE's operations during this Chapter 11 case.  The DIP Financing is proposed as secured financing on any unencumbered assets (other than Avoidance Actions), junior secured financing on any encumbered assets, and a superpriority administrative claim basis.  If the plan is confirmed, the DIP loan will be exchanged into exit financing with additional funds being advanced, and the DIP loan will only be paid back under certain conditions.

36.     I am the CEO of both the Debtor and the Foundation.  The following individuals are directors of both entities: Michael Rosen, Chairman, Fred Brown, Secretary, Felix Fraraccio, Paul Sanders and Sherry Wheaton.

37.     The Foundation has retained separate counsel, the law firm of Hall Render in Indianapolis.

C.  **Circumstances Leading to Filing**

38.     RTE is unable to generate enough cash from operations to pay its operating expenses and its debt service on the Series 2001 Bonds.  Due to its financial difficulties, RTE has not made the payments for the Series 2001 Bonds that were due in May 2013, November 2013, and May 2014.  RTE believes that the Indenture Trustee used certain monies in the Debt Service Reserve Fund to pay the amounts due to bondholders for the May 2013 bond payment.

39.     RTE believes that there are approximately 1,400 holders of the Series 2001 Bonds.  As a result, the _only_ means for RTE to accomplish a restructuring of the Series 2001 Bonds is through a Chapter 11 reorganization. In addition, because RTE is a CCRC, it falls within the regulatory oversight of the Indiana Securities Division, which sometimes has responsibility for repayment of resident entrance fee obligations where a CCRC has financial troubles. One option available to the Securities Division would be appointment of a receiver for the Community.  RTE believes that a receivership would likely result in a sale of the Community after a substantial delay and at a depressed sale price.  The Plan ensures that RTE's residents, who are RTE's revenue source for repaying the bondholders, will get to remain at the Community and all obligations to residents will be paid by RTE in the ordinary course of business.

40.     This Chapter 11 case is intended to enable the Community to emerge financially stronger and to continue to provide the high standard of services, care, and amenities the residents and future residents have come to expect.  RTE has filed a plan and disclosure statement on the first day because RTE is committed to the quick resolution of its financial difficulties and emergence from bankruptcy with the best possible outcome for RTE's residents, bondholders, and other creditors.

41.     Accordingly, RTE filed for relief under Chapter 11.

## II.     SUMMARY OF FIRST DAY PLEADINGS AND PLAN

### A.  **The Plan**

42.     As discussed above, the Debtor intends to file on or around the Petition Date a Plan of Reorganization (the "Plan").  The Plan provides for payment of administrative and , priority claims will be paid in full, and unsecured claims (with the exception of the unsecured

claim of RTEF, which will not be paid) will be paid over 6 months without interest. The Plan also provides that the claims of all residents and former residents of the Community will be paid in accordance with the applicable resident agreements and in the ordinary course of business of the Debtor.

43.     The Plan provides that bondholders will exchange their bonds for new 2014 bonds in the amount of $7.5 million which will be paid over time with interest, or, if a buyer comes forward willing to pay cash of at least $6.0 million plus certain closing and reorganization costs, the bondholders will receive the net cash proceeds from the sale of RTE's business.

44.     The treatment of the DIP Claim of RTEF varies depending on the Payment Plan versus Plan Sale scenarios, and the unsecured claim of RTEF will not result in any distribution to RTEF unless proceeds remain after payment to all other classes of claims.

45.     The Debtor intends to move for approval of a disclosure statement and confirmation of the Plan promptly.

**B.      First Day Pleadings**

46.     Concurrently with the filing of this chapter 11 case, the Debtor has filed a number of First Day Pleadings. I have reviewed each of these First Day Pleadings and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtor to operate in chapter 11 with a minimum of disruption to its business.

47.     The Debtor anticipates that the Court will conduct a hearing soon after the commencement of this chapter 11 case (the "First Day Hearing") at which the Court will hear and consider the First Day Pleadings. The First Day Pleadings are described below.[1]

---

[1] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings. The descriptions of the First Day Pleadings contained herein are only intended to be summaries.

48.    Generally, the First Day Pleadings have been designed to meet the primary goal of continuing the Debtor's operations postpetition in a manner that will minimize any potential impact on RTE's residents and vendors while seeking to implement the restructuring contemplated by the Plan through an orderly bankruptcy process.  As such, the First Day Pleadings seek to:  (i) obtain use of cash collateral and postpetition financing; (ii) protect residents, employees and vendors and ensure a smooth transition into chapter 11; (iii) maintain the Debtor's operations and business throughout this chapter 11 case; and (iv) efficiently administer the bankruptcy case; and (v) provide the basis for confirming the Plan.  I also believe that it is critical that the First Day Pleadings be heard as soon as possible at a "First Day Hearing" to avoid immediate and irreparable harm to the Debtor's estate.  If the relief requested in the First Day Pleadings is not granted on an expedited basis, the Debtor will not have access to cash and will be unable to pay its employees and continue to provide the services that are critical to the elderly residents at RTE.

**A.    Motion of the Debtor for Entry of an Order (A) Scheduling an Expedited Hearing on First Day Motions and Applications Filed by the Debtor and (B) Approving the Form and Manner of Notice Thereof**

49.    The Debtor requests entry of an order, among other things, convening expedited hearings on certain First Day Motions and Applications, and approving the form and manner of notice thereof.  As set forth in detail in each of the First Day Motions and Applications, the relief requested in the First Day Motions and Applications is essential to maintaining the Debtor's business and thereby maximizing the value of the Debtor's assets for the benefit of its estate and creditors.  Accordingly, I believe that the First Day Motions and Applications involve matters that require an expedited hearing and respectfully request that this Court schedule such hearing as soon as is practicable.

**B. Motion of the Debtor to Set Noticing, Case Management and HIPAA Information Procedures**

50.     The Debtor requests that this Court approve certain notice, case management and HIPAA information procedures in this chapter 11 case.  It is my understanding that these proposed Case Management Procedures will aid in the efficient administration of this chapter 11 case while ensuring that all parties with significant interests in the proceedings in this chapter 11 case have an opportunity to be heard.

51.     For all of Debtor's residents and former residents (the "Residents"), whose personal information is or may be protected by HIPAA, Debtor needs specific protection as proposed in the motion.

**C. Expedited Motion of the Debtor for Entry of Interim and Final Orders (i) Authorizing the Use of Cash Collateral; (ii) Approving Adequate Protection and (iii) Scheduling a Final Hearing**

52.     It is my understanding that it is essential that the Debtor obtain the authority to use the Cash Collateral in this chapter 11 case in order to preserve and maximize the value of its assets.  The Cash Collateral will be used to pay for expenses incurred by the Debtor in the ordinary course of business and in connection with this chapter 11 case.  These expenses include, but are not limited to, employee payroll and benefits, payments to utility providers, payments necessary to maintain services necessary to the Residents and other expenses incurred in connection with the Debtor's business operations, as well as expenses otherwise necessary in connection with this chapter 11 case, including but not limited to, the payment of fees to the United States Trustee and the payment of fees and expenses of certain professionals retained by the Debtor in this chapter 11 case.

53.     As the Debtor has extremely limited funds, the use of the Cash Collateral is required to fund the day-to-day operating expenses, including payments to employees, payments

14

required for Resident care and sustaining the going concern value of the Debtor's business operations. Unless this Court authorizes use of the Cash Collateral, the Debtor will be unable to pay for services and expenses necessary to preserve and maximize the value of the Debtor's assets. Indeed, absent sufficient funds to support the Debtor's business operations, the value of the Debtor's assets may quickly erode. More importantly, the Debtor's ability to maintain Resident services could be limited or destroyed.

54.     Immediate access to the use of the Cash Collateral is necessary to provide working capital during this chapter 11 case to fund operations and to ensure the success of this chapter 11 case. Accordingly, I believe that the relief requested in the Motion and authorization of the Debtor's use of the Cash Collateral on an interim and permanent basis is in the best interests of the Debtor, its estate and its creditors.

**D.**  **Motion of the Debtor for Interim and Final Orders (i) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364; (ii) Granting Liens and Superpriority Claims; (iii) Scheduling Final Hearing on the Debtor's Motion to Incur Such Financing on a Permanent Basis Pursuant to Bankruptcy Rule 4001**

55.     The Debtor has filed a motion for Debtor-in-possession financing, which RTE believes is critical to its operations. However, RTE is not requesting a first day hearing as it believes it can operate on cash collateral for a very short period, and RTE is attempting to avoid the need for an emergency first day hearing on a DIP.

56.     Prior to the Filing Date, the Debtor attempted to obtain postpetition financing proposals from other lenders, but was unable to obtain postpetition financing in the form of unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code and/or unsecured credit allowable under section 364(a) or (b) of the Bankruptcy Code. In particular, at my direction, the Debtor's financial advisor North Shore Consulting, contacted lenders regarding DIP Loans. Specifically, I understand that North Shore

Consulting contacted two lenders that typically make debtor-in-possession loans, Healthcare Finance Group in New York and White Springs Capital Management in Minnesota. I understand that both are experienced at making DIP loans, including in the healthcare industry. Both declined to entertain a DIP loan being made on a junior or unsecured basis, especially where the senior liens are held by a dissipated group of approximately 1,400 bondholders who have not previously indicated consensus on an exit strategy that would ensure repayment of the DIP loan. In addition, I understand that both indicated that it was unlikely that a market exists for similar DIP loans from an unrelated party, and one noted that if such a loan did exist, the interest rate would be in the high double digits.

E. **Motion of the Debtor for an Order (a) Authorizing the Debtor to (1) Pay and Honor Certain Prepetition Claims for (i) Wages, Salaries, Employee Benefits and Other Compensation and (ii) Withholdings and Deductions; (2) Continue to Provide Certain Employee Benefits in the Ordinary Course of Business; and (3) Pay all Related Costs and Expenses; and (b) Directing Banks to Receive, Process, Honor and Pay all Checks Presented for Payment and Electronic Payment Requests Relating to the Foregoing**

57.     The Debtor employs approximately 140 full time and part time employees, whose skills, knowledge and understanding of the Debtor's infrastructure, operations and customer relations are essential for a successful chapter 11 case and to maintain the value of the Debtor's assets and business.

58.     Therefore, the Debtor seeks authority, in its discretion, to pay and honor certain prepetition claims for Employee Wages and Benefits, and also to modify, change and discontinue any of the Employee Wages and Benefits in order to implement new Employee Wages and Benefits in the ordinary course of business during this chapter 11 case, in its discretion, without the need for further approval from this Court.

59.     As of the Petition Date, approximately $80,000 in Unpaid Compensation earned prior to the Petition Date remains unpaid to Employees. On average, prepetition payroll

Deductions equal approximately $6,824.99 in the aggregate for each pay period, and the Debtor seeks to continue to honor and pay these, as well as Payroll Taxes, in the ordinary course. It is my understanding that Payroll Taxes equal approximately $35,640.00 in the aggregate for each month, with approximately $18,810.00 attributable to Employer Payroll Taxes and approximately $16,830.00 attributable to Withheld Amounts.

60.     It is my understanding that, as of the Petition Date, Reimbursable Expenses are de minimus (less than $1,000, and potentially $0). It is my understanding that the Debtor's approximate monthly cost for maintaining Health Benefits is $17,407.32 in the aggregate, which includes medical benefits.

61.     It is my understanding that on average, the Debtor pays approximately $5,153.00 monthly for workers' compensation premiums.

62.     The Debtor uses Merit for payroll processing and related services pursuant to the Client Agreement. The Debtor incurs costs incident to employee compensation, such as processing costs, payroll administration costs and the employer portion of payroll-related taxes, as well as accrued but unpaid prepetition charges for administration of the Benefit Programs (collectively, the "Prepetition Processing Costs"). The Debtor estimates that the aggregate amount of Prepetition Processing Costs accrued but unpaid, as of the Petition Date, was approximately $2,900.00. The Debtor seeks to pay all Prepetition Processing Costs.

63.     I believe the relief requested in this Motion is absolutely critical, as the Employees are vital to the continued operation of the Debtor's businesses and the Debtor's chapter 11 efforts.

F.     **Motion of the Debtor for Entry of an Order (i) Approving Continued Use of Existing Cash Management System, (ii) Authorizing Use of Prepetition Bank Accounts and Business Forms, and (iii) Waiving Certain Requirements of the United States Trustee**

Case 14-11829-reg    Doc 6    Filed 07/22/14    Page 18 of 28

64.     The Debtor's businesses and financial affairs are complex because, among other things, the Debtor is a healthcare provider, and because the Debtor handles resident funds for which the Debtor has varying obligations.  To lessen the disruption caused by this chapter 11 case and maximize the value of the Debtor's estate, it is essential that the Debtor be allowed to maintain its well-developed Cash Management System.

65.     In the ordinary course of business, the Debtor maintains five (5) accounts at PNC Bank, National Association, which include an operating account, checking accounts and a savings-escrow account.

66.     Importantly, as a healthcare provider, the Debtor receives payments for healthcare services from certain third-party payors, including government Medicare and Medicaid payments, and from time to time, TRICARE and private insurance payments.  These payments are directed to the Debtor's main operating account, and any requirement to close that account and open a new operating account would result in a significant interruption in Debtor's cash flow from these third-party payors.  It is critical that the Debtor avoid any disruption in cash flow in this case.

67.     Further, the Debtor holds a Resident Trust Fund Account to which residents or their families regularly deposit money and from which residents can withdraw funds for services and amenities at the Community, and Debtor requests authority to continue honoring resident requests for access to their funds in that account.

68.     The Debtor seeks authority to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.  Among other new bank accounts that the Debtor may potentially open in the normal course of business operations, it is my understanding that the Debtor intends to open

18

a new escrow account at PNC Bank in order to comply with the adequate assurance provisions of the Utility Motion filed contemporaneously herewith.

69.    The Debtor also requests authority to use its respective correspondence and business forms without placing the label "debtor in possession" on each such correspondence or form, as changing correspondence and business forms would be unnecessary and burdensome to the Debtor's estate, as well as expensive and disruptive to the Debtor's business operations.

70.    The Debtor will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by this Court, the Debtor will work closely with the Cash Management Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

71.    For the foregoing reasons, I believe the relief requested is in the best interests of the Debtor, its estate and its creditors.

**G.    Motion of the Debtor for Entry of an Order Under 11 U.S.C. §§ 105(a) and 366 (i) Prohibiting Utilities from Discontinuing, Altering, or Refusing Service, (ii) Approving Proposed Adequate Assurance of Payment, and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance of Payment of Utilities**

72.    In the operation of its business, the Debtor incurs utility expenses for, among other things, water, electricity, natural gas, telephone, cable and internet service in the ordinary course of business.  These utility services are provided by numerous Utility Providers in connection with approximately eight (8) accounts.  On average, the Debtor spends approximately $21,398 each month on utility costs. It is my understanding that, as of the Petition Date, approximately $15,186 in utility costs were outstanding to the various Utility Providers.

73.     Uninterrupted utility services are essential to the Debtor's ability to conduct its business including its ability to provide for the safety and well-being of its Residents and, therefore, essential to this chapter 11 case.  Should the Utility Providers refuse or discontinue service to the Debtor, even for a brief period, the Debtor's business operations would be severely disrupted and Resident care could be put at risk.

74.     Simply put, it is my understanding that without utility service, the Debtor's operations will immediately shut down.  An interruption of utility services would negatively impact the Debtor's business operations, its Residents, revenue, and profits, seriously jeopardizing the Debtor's efforts in this chapter 11 case and negatively impacting the value of the Debtor's estate.  It is, therefore, critical that utility services continue uninterrupted.

75.     It is my understanding that the Debtor intends to pay all postpetition obligations owed to the Utility Providers in a timely manner.  The Debtor expects that revenue from the Debtor's business and continued operations plus funds from the proposed Debtor-In-Possession financing will be more than sufficient to pay the Debtor's postpetition obligations, including all postpetition utility obligations.

76.     Nevertheless, subject to approval of the DIP Motion, the Debtor proposes to make a deposit of $10,700 into a newly created, segregated, interest-bearing account within seven (7) business days of this Court's entry of the Utility Order (the "Utility Deposit").  This amount is equal to 50% of the Debtor's estimated monthly cost of its utility consumption, based on the historic average over the past 3 months, from each Utility Provider listed on the Utility Service List.

**H. Application for an Interim and Final Order Authorizing the Employment, Retention and Compensation of Globic Advisors as Notice and Solicitation Agent for the Debtor and Debtor-in-Possession *nunc pro tunc as of the Petition Date***

77.     By the above-referenced Application, the Debtor seeks approval of the appointment of Globic as notice and solicitation agent in this chapter 11 case pursuant to the terms of the Globic Engagement Letter.

78.     It is my understanding that as the notice and solicitation agent, Globic will, among other things, (i) distribute required notices to parties in interest, including being the sole party maintaining the service list for residents whose information constitutes protected healthcare information, and (ii) solicit, collect, and tabulate acceptances and rejections of the Debtor's plan of reorganization from parties entitled to vote thereon.

79.     As mentioned above, the Debtor is obligated on a certain 2001 Series bond issue (the "2001 Series Bonds") which are held by approximately 1,400 beneficial holders.  The Bank of New York acts as indenture trustee and master indenture trustee for the bonds, but it is my understanding that for voting on the Debtor's plan, the beneficial holders are required to be solicited individually.

80.     In my opinion, in light of the complexities of solicitation of actual beneficial holders (and not just the brokerage firms and other institutions that hold the bonds "in street name" for the beneficial holders) the Debtor needs Globic retained to carry out the mechanics of the voting solicitation on its plan of reorganization.  In short, I believe Globic is necessary as an agent in this case to ensure proper notice and balloting, and needs to start quickly to make a determination of the identifies of the beneficial holders of the bonds.

81.     Further, the Debtor is a continuing care retirement facility that provides healthcare and other services to residents of the Community. As a result, certain of Debtor's creditors are parties whose personal information is protected by the Health Insurance

Portability and Accountability Act of 1996 ("HIPAA"), and their information needs to be protected in connection with this filing. In that regard, the Debtor has proposed that Globic will be the sole party with the unredacted matrix and will be in charge of sending notices to Residents for the Debtor and any party filing a document that must be served on residents.

82. It is my understanding that Globic is a noticing agent that specializes in providing comprehensive chapter 11 and bondholder noticing services with efficient and cost-effective methods to properly handle the voluminous mailings associated with the noticing and solicitation portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest.

83. Accordingly, I respectfully submit that authorizing the Debtor to employ and retain Globic as Noticing and Solicitation Agent for the Debtor in these chapter 11 proceedings is necessary and in the best interest of the Debtor and its estate.

## I. Expedited First Day Motion of the Debtor for Determination that Appointment of a Patient Care Ombudsman is Unnecessary

84. The Debtor requests that this Court enter an order finding that the appointment of a PCO is not necessary in this chapter 11 bankruptcy case to, among other things, protect the Debtor's residents.

85. The Debtor has a strong history of providing high level of care to its residents, and the Debtor is committed to maintaining the quality of its residents' care after the Petition Date. The Debtor's bankruptcy filing was necessitated by financial difficulties wholly unrelated and in no way connected to resident care.

86. I am not aware of any evidence that the financial difficulties have impacted or will impact the Debtor's abilities to provide a high level of care to its residents.

87.     It is my understanding that the Debtor is monitored by, among others, various licensing and regulatory agencies (state and federal), including but not limited to, 1) Center for Medicare and Medicaid Services, 2) State of Indiana Department of Health, 3) State of Indiana Long Term Care Ombudsman and 4) the Indiana Secretary of State, Securities Division.

88.     To my knowledge, no reviewing authority has raised any issues with respect to quality of care or resident safety at the Debtor's assisted living facilities.

89.     The Debtor has implemented extensive internal procedures to adequately address any concerns or complaints that the residents may have with respect to the care provided by the Debtor. Each new resident receives written and verbal information with contact information of the Executive Director of Debtor, the Long Term Care Ombudsman's office and Debtor's Director of Social Services.  A toll free hotline number is available to residents and staff to voice concerns about resident rights.   Other concerns may be expressed directly RTE's Executive Director or Director of Social Services. Both are charged with serving the Debtor's nonprofit mission of serving elderly residents of Wells County.

90.     I believe the appointment of a PCO for the pendency of the Chapter 11 Cases would only duplicate the efforts of the various public and private entities overseeing the Debtor's operations and ensuring the safety and welfare of the Debtor's residents, and would impose unnecessary costs on the Debtor's estate.

91.     In my opinion, the cost of a PCO could inhibit the Debtor's ability to make progress in this chapter 11 case.  Specifically, the appointment of a private PCO could, depending on the budget for a PCO, significantly increase the administrative expenses of this chapter 11 case, and thus, consuming the limited resources of the Debtor's estate without adding any significant value to the Debtor's residents.

92.    Accordingly, I believe that the relief requested in the Ombudsman Motion is in the best interests of the Debtor's estate, its creditors, residents and other parties in interest.

**J.  Motion of Debtor for Entry of an Order Authorizing Debtor to Honor Claims Relating to Resident Entrance Fees, Escrow Agreements and Move-In Deposits**

The Debtor requests authority to honor non-disputed, post-petition Entrance Fee Refund Claims, as well as Escrow Agreements and Move-In Deposits, in the ordinary course of business, including using, to the extent necessary in Debtor's sole discretion, proceeds from any debtor-in-possession financing obtained post-petition, and submits that there are compelling legal and economic reasons for permitting such relief as set forth herein.

93.    To live in the Community, residents are required to enter into a residency agreement with RTE. Over the life of the Community, there have been a number of forms of residency agreements, most of which are Entrance Fee Agreements ("Entrance Fee Agreements"), and more recently, which are Community Fee Agreements ("Community Fee Agreements," and collectively with Entrance Fee Agreements, "Residency Agreements").

Pursuant to these agreements, residents receive the amenities associated with living at Community and are permitted the exclusive right to occupy a specific unit, subject to certain conditions.

94.    In addition to the up-front fee to live in the Community, residents pay monthly service fees , as well as fees for healthcare services in the higher-acuity units in the Community. Certain additional services are available to the residents on a fee-for-service basis, including guest meals, additional resident meals, additional housekeeping services, laundry services and personalized transportation.

95.    The purpose of the Entrance Fees and Community Fees is to generate income to contribute to the operating income of the Community and to help pay for operating and capital costs, among other things.

96.    As RTE began to experience financial difficulties, it determined in mid-2013 that it was appropriate to make arrangements to escrow refundable entrance fees under new Entrance Fee Agreements in order to give prospective residents confidence to move-in to the Community. Accordingly, RTE established an escrow for Entrance Fees for future residents, and RTE is holding the funds in an escrow account at PNC Bank (the "Entrance Fee Escrow") pending resolution of its restructuring.  The total amount of the Entrance Fee Escrow is approximately $268,000, which consists of funds related to Residency Agreements on four (4) units (the "Escrow Agreements").  During the past year, RTE has placed all new Entrance Fees received into the Entrance Fee Escrow.

97.    The Debtor has recently received two move-in deposits (the "Move-in Deposits") from prospective residents, one under a Community Fee Agreement in the amount of approximately $2,400, and the other for a prospective assisted living resident for approximately $300.

98.    To my knowledge, RTE is current on all of its Entrance Fee Refund Claims, and there are no refunds owed at this time, although some may be owed upon the re-occupancy of certain units in the future.  RTE's total contingent liability for Entrance Fee Refund Claims likely to be due over the next 7 to 8 years is approximately $1,908,450.00 as of May 31, 2014.[2]

---

[22] Note that for GAAP purposes, delayed revenue recognition on entrance fees received requires that RTE's books and records show approximately $3.5 million in entrance fee liabilities; however, the maximum cash that RTE would be required to pay in entrance fee refunds would be the approximately $1.9 million number.

Senior citizens who signed the Entrance Fee Agreements entered the independent living facility and paid their Entrance Fees based upon their understanding that a portion of their Entrance Fees would be refunded to them or their heirs pursuant to the terms of their Residency Agreements. Residents who signed the 0% Agreement also have an expectation of a partial refund to themselves or their estates if their Residency Agreement terminates in less than 30 months.

Residents paid and continue to pay for life services, at arm's length, and failure to honor their Residency Agreements with RTE will unfairly externalize the risk of RTE's enterprise on a group that needs the most protection – senior citizens. Thus, public policy concerns, along with a sense of fairness and equity, support the payment of these claims.

99.     Accordingly, I believe it is in the best interests of RTE, its estate, creditors, parties in interest, and particularly residents for RTE to be authorized to honor Entrance Fee Refund Claims, Escrow Agreements, and Move-In Deposits in the ordinary course without further application to the Court.

100.     Further, with regard to the Escrow Agreement, I believe it is imperative that RTE be allowed to extend the "Trigger Date" thereunder to the later of 60 days after (i) the Effective Date of any Plan, or (ii) the consummation of a sale of the Community.  Right now, the Escrow Agreement provides that the escrow triggers at 60 days after a bankruptcy filing, which is an error; the residents with funds in the escrow would have to make an immediate decision before seeing the outcome of this case, and RTE is concerned that in this situation the residents may chose to terminate their residency and receive the return of their funds, but given an extension, RTE believes that the residents are more likely to continue the status quo and stay, pending the outcome of this case.  Termination would have a negative effect on the Community, because RTE would lose the future potential entrance fees as well as monthly income.

**III.**    **Expedited Hearing**

101.    The Debtor believes that any delay in adjudicating the above First Day Motions will do serious damage to the Debtor's estate, creditors and residents. Therefore, the Debtor intends to seek an order from this court scheduling an expedited First Day Hearing on these First Day Motions and approving the form of notice of these First Day Motions and the First Day Hearing.  As described in detail in each of the First Day Motions, the expedited relief requested in the First Day Motions is essential to: (i) obtain use of cash collateral; (ii) protect residents and ensure a smooth transition into chapter 11; (iii) maintain the Debtor's operations and business throughout this chapter 11 case; (iv) efficiently administer the bankruptcy case; and (v) provide the basis for confirming the Plan. The First Day Motions are of the type typically heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtor's operations and its transition into operating as a chapter 11 debtor in possession.

**IV.**    **Conclusion**

102.    For the forgoing reasons, I respectfully submit that the relief sought in the First Day Pleadings is necessary and appropriate, and request that the Court grant the requested relief. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 21, 2014

David Stewart, Chief Executive Officer
of River Terrace Estates Inc.