IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **RIVER TERRACE ESTATES, INC.** | ) | Case No. 14-11829 |
| | ) | Chapter 11 |
| Debtor. | ) | Judge Robert E. Grant |

## DISCLOSURE STATEMENT, PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE, FOR PLAN OF REORGANIZATION DATED JULY 22, 2014 OF RIVER TERRACE ESTATES, INC. UNDER <u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. FURTHER, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

Jeffrey A. Hokanson, Esq.
Frost Brown Todd LLC
201 N. Illinois Street
Suite 1900
Indianapolis, Indiana 46204

-and-

Bobby Guy, Esq.
Robin Bicket White, Esq.
Frost Brown Todd LLC
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1900
Nashville, TN 37201

-and-

Ronald E. Gold, Esq.
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202-4182

**PROPOSED ATTORNEYS FOR RIVER TERRACE ESTATES, INC., DEBTOR AND DEBTOR IN POSSESSION**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1
II.     OVERVIEW OF THE PLAN ................................................................................ 2
III.    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND
        INTERESTS UNDER THE PLAN ...................................................................... 5
        A.  TREATMENT OF CLAIMS AND INTERESTS ......................................5
        B.  CLAIMS UNDER THE PLAN ................................................................5
IV.     GENERAL OVERVIEW AND BACKGROUND INFORMATION............................... 9
        A.  BACKGROUND, GENERAL INFORMATION AND EVENTS LEADING TO
            THE CHAPTER 11 CASE ......................................................................9
        B.  SIGNIFICANT POST-PETITION EVENTS ...........................................12
V.      VALUATION ................................................................................................. 16
VI.     THE PLAN .................................................................................................... 16
        A.  TIMELINE TO UNDERSTAND DETERMINATION OF OUTCOME AS A
            PAYMENT PLAN OR PLAN SALE ......................................................16
        B.  TREATMENT OF CLAIMS UNDER THE PLAN ....................................17
        C.  MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN .............21
        D.  DISCHARGE, RELEASES AND INJUNCTIONS ....................................25
VII.    RESERVATION AND SETTLEMENT OF CLAIMS .......................................... 28
VIII.   PROCEDURE FOR RESOLVING DISPUTED CLAIMS, ADMINISTRATIVE
        CLAIMS, AND IN RESPECT OF DISTRIBUTIONS ...................................... 30
IX.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES........................................ 32
X.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES................................. 34
XI.     LIQUIDATION ANALYSIS UNDER CHAPTER 7................................................ 34
XII.    CONFIRMATION PROCEDURE ...................................................................... 35
        A.  VOTING AND OTHER PROCEDURES. .................................................35
        B.  DISCLAIMERS AND ENDORSEMENTS ...............................................37
        C.  THE CONFIRMATION HEARING ........................................................37
        D.  CONFIRMATION.................................................................................38
        E.  UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS..................38
        F.  FEASIBILITY ....................................................................................40
        G.  BEST INTEREST TEST .......................................................................40
        H.  CERTAIN RISK FACTORS TO BE CONSIDERED ...............................41
XIII.   CONCLUSION AND RECOMMENDATION................................................. 44

## <u>EXHIBITS TO DISCLOSURE STATEMENT</u>

EXHIBIT D-1          CHAPTER 11 PLAN OF REORGANIZATION
EXHIBIT D-2          DISCLOSURE STATEMENT ORDER
EXHIBIT D-3          LIQUIDATION ANALYSIS
EXHIBIT D-4          PRO FORMA FINANCIAL RESULTS

(ii)

## I.    INTRODUCTION

River Terrace Estates, Inc. (the "Debtor", the "Company" or "RTE"), submits this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code and Rule 3017 of the Bankruptcy Rules, for use in the solicitation of votes on its Plan of Reorganization of River Terrace Estates, Inc. dated July 15, 2014 (the "Plan"). Attached as Exhibits to this Disclosure Statement are copies of (i) the Plan (Exhibit D-1) and (ii) an Order of the Court dated _____, 2014 (the "Disclosure Statement Approval Order") which, among other things, approves this Disclosure Statement and establishes certain procedures with respect to the solicitation of votes to accept or reject the Plan (Exhibit D-2).

All capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in the Plan, unless otherwise noted. All dollar amounts provided in this Disclosure Statement and in the Plan are given in United States Dollars, unless otherwise noted.

The Plan is the means by which RTE proposes to restructure its debts, including its Series 2001 Bonds, either paying the Series 2001 bondholders through a Payment Plan or through the net proceeds of a sale of RTE's continuing care retirement community (the "Community"). RTE will reinstate the obligations that it owes to other creditors, including the Residents of the Community, with the exception of certain of its general unsecured creditors, who will be paid in full over six months without interest following emergence from bankruptcy.

This Disclosure Statement sets forth certain information regarding the Debtor's operating and financial history, the need to seek chapter 11 protection, significant events that are expected to occur during the chapter 11 case, and the anticipated organization, operations, and financing of the Debtor upon successful emergence from chapter 11 (the "Reorganized Debtor"). This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted, including the deadlines by which ballots must be received.

**RTE STRONGLY URGES ACCEPTANCE OF THE PLAN, AND URGES ALL CREDITORS ENTITLED TO VOTE THEREON TO VOTE TO ACCEPT THE PLAN.**

## II.    OVERVIEW OF THE PLAN

*The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.*

RTE is proposing a plan of reorganization (the "Plan"). The goal is to ensure that the Bondholders and creditors get the maximum return on their investments. The Plan provides that bondholders will exchange their bonds for new Series 2014 Bonds with a par amount of $7.5 million, or, if a buyer comes forward willing to pay cash of at least $6.0 million plus certain reorganization costs, the Bondholders will receive the net cash proceeds from the sale of RTE's continuing care retirement community (the "Community").

### 1.    Why did RTE develop this plan?

The Community has experienced lower than planned occupancy and pricing pressure since it opened in 2003 and does not generate enough annual cash flow to cover both its operating expenses and the payments on the Series 2001 Bonds.  The Series 2001 Bonds currently have an outstanding principal balance of $14,000,000 and are held by approximately 1,400 Bondholders.  With this many holders, the only way for RTE to restructure the bonds, or to sell the Community in a controlled sale process that preserves value, is through a Chapter 11 bankruptcy proceeding.

### 2.    What is the biggest risk to RTE's bondholders and creditors?

The biggest risk for recovery to RTE's creditors is that RTE, unable to pay its debts, files bankruptcy without either a reorganization plan or a buyer for the Community.  The reason is that bankruptcy is very expensive, and without a plan of reorganization to set a minimum price, RTE may be forced to sell the Community at an open auction in bankruptcy at a very low price, or RTE may run out of money to fund the bankruptcy while looking for buyers.  RTE has already had the Community appraised, and the appraisal indicates that the value is approximately $4.7 million as of April 1, 2014.  RTE believes that a sale will bring even less cash proceeds for the Bondholders, especially after bankruptcy and selling expenses.  RTE is further concerned that the uncertainty of a lengthy marketing process may damage operations and actually reduce the value of the Community in a sale.  As a result, RTE has proposed the Plan in connection with its bankruptcy filing.

### 3.    How does RTE's Plan take care of these risks?

The Plan is specifically designed to avoid these risks.  The Plan proposes to pay the bondholders the most that RTE believes it is able to pay in light of the Community's occupancy and market, with a resulting par amount that is substantially more than the appraisal.  But, recognizing that much of the Bondholder's recovery would be received in future payments, RTE will sell the Community to a cash buyer that comes forward with at least $6.0 million plus certain restructuring expenses, within seven days after the close of the bankruptcy.  RTE has

2

already begun marketing the Community to ensure that it has the maximum time available to find potential buyers, so if there is an opportunity to sell the Community at a better recovery to bondholders, RTE will do that.

**4.      Why does the Plan also have a potential sale?**

Essentially, RTE's $7.5 million payment plan sets a minimum price on any sale, to make sure that the Community does not end up in a low value sale, and to maximize the recovery for the Bondholders and RTE's other creditors, including the residents. If no buyer comes forward to pay at least $6.0 million for the Community in the sale time being proposed, then RTE will keep the Community and the Bondholders will receive $7.5 million in Series 2014 bonds in exchange for their Series 2001 Bonds. If a buyer comes forward to pay at least $6.0 million, then RTE will sell the Community. If several buyers come forward, then RTE will auction the Community and sell it to the highest bidder over the minimum price.

**5.      Why is the minimum sale price set at $6.0 million plus the bankruptcy expenses, instead of $7.5 million?**

RTE believes that the present value of the Series 2014 Bonds could be interpreted as approximately $6.0 million, depending on the discount rate used, and RTE is using this number as the purchase price number for a cash buyer. In addition, if a cash buyer comes forward willing to pay at least $6.0 million, then RTE believes that many of the Bondholders would probably rather take the immediate cash than take debt service payments over time.

**6.      What happens if the Bondholders do not approve the Plan?**

If the Bondholders do not approve the Plan, then RTE anticipates having to sell the Community in the bankruptcy without a floor price. The risk is that the bondholders would receive substantially less than what RTE is proposing in the Plan, because there is no minimum value that a buyer must pay, and RTE could run out of money if the bankruptcy continues for a long period of time. The longer the bankruptcy goes on, the more the Community's occupancy levels are likely to decrease and the Community's operating cash flow is likely to deteriorate so that the restructuring plan included in the Plan would no longer be feasible. Getting the plan approved immediately gives RTE the ability to pay the most money to bondholders, and protects the stability of RTE's operations. In certain other bankruptcies involving continuing care retirement communities ("CCRCs") in recent years, bondholders have ultimately chosen a restructure plan after receiving a very low proposed sale price from buyers, but the cost of the sale process and lengthy bankruptcy has resulted in lower recovery for those bondholders after the costs of the bankruptcy; here RTE is minimizing costs and preventing that scenario by proposing a plan at the beginning that provides for the bondholders to receive the best recovery possible whether it comes through a payment plan or a sale.

In addition, the bankruptcy is being funded in part by RTE's supporting charitable foundation, the River Terrace Estates Foundation (the "Foundation"), through a loan. If the Plan is not approved, there is no assurance that the Foundation will continue to loan its funds into the restructuring of RTE. Right now, the Foundation is making available approximately $600,000 on

3

the restructuring and bankruptcy-related expenses of RTE, and is proposing to allocate an additional $500,000 for RTE to use in its $7.5 million payment plan. These are virtually all the assets of the Foundation, and the Foundation is not liable for the bonds. The Foundation is doing this solely to support RTE. If the Plan is approved and the payment plan is implemented, the Foundation will be paid back only if the Community is performing well and annual debt service payments are being made to the bondholders. If the Plan is approved and the Community is sold, the Foundation will waive most of the loan, so that bondholders get at least the full $6.0 million in proceeds. If the Plan is not approved, there is no guarantee that the Foundation will continue to support RTE's reorganization, and it could apply its funds to other charitable uses to support senior living in Wells County, Indiana.

       **7.**      **Why did RTE file bankruptcy instead of finding another way to communicate its Plan to bondholders?**

Based on specific complications that exist with bond financing and the fact that there are approximately 1,400 bondholders, Chapter 11 is the *only* feasible way for RTE to restructure the bonds or to sell the Community. Other sale methods would be likely to bring substantially less for the bondholders. In addition, because RTE is a CCRC, it falls within the regulatory oversight of the Indiana Securities Division, which sometimes has responsibility for repayment of resident entrance fee obligations where a CCRC has financial troubles. One option available to the Securities Division would be appointment of a receiver for the Community. RTE believes that a receivership would likely result in a sale of the Community after a substantial delay and at a depressed sale price. The Plan ensures that RTE's residents, who are RTE's revenue source for repaying the Bondholders, will be able to remain at the Community and all obligations to residents and former residents will be paid by RTE in the ordinary course of business. RTE believes that the highest value available to the Bondholders (and all stakeholders) is through its Plan, which proposes that the Bondholders receive the best of either a payment plan over time or a sale at a controlled price.

       **8.**      **How are RTE's other creditors treated in the Plan?**

RTE has very little debt other than the bonds. In order to preserve the value of the Community for the Bondholders, RTE is essentially current on all of its operational debts. RTE cannot afford to pay annual debt service on the Series 2001 Bonds in their current amount and pay for its operations; the Community simply does not generate enough cash. RTE's other debts are typical debts from operations and are in small amounts, including items such as (i) approximately $75,000 of vendor debt as of the filing, (ii) ongoing obligations to employees (with payroll of approximately $120,000 every two weeks), (iii) resident entrance fee refund obligations anticipated at approximately $1.9 million over the next 7 to 8 years, none of which are currently due, (iv) contractual obligations to residents for monthly living and care, and (v) approximately $5.5 million for past loans from the Foundation, which loans are not being repaid under the Plan unless the Bondholders and other creditors are first paid in full. All creditors other than the Bondholders and the Foundation will be paid in full, and to preserve RTE's cash flow, unsecured vendor claims are being paid in full over six months without interest after conclusion of the bankruptcy. Therefore, the only creditors entitled to vote on the Plan are

4

the bondholders, the Foundation, and the unsecured vendors. The Foundation's vote will not be counted, however, because it is affiliated with RTE.

The Foundation has also extended a loan (approved by the Bankruptcy Court) to support RTE during this bankruptcy, and will extend exit financing to RTE if the plan is approved.

**9.      How do I vote on the Plan?**

Globic Advisors has been appointed as the Voting Agent by the Bankruptcy Court.   If you are receiving a ballot with this Disclosure Statement, then you are entitled to vote on the Plan.  For your vote to be counted, it must be filled out completely (including, if you are the holder of a Series 2001 Bond, to indicate the full amount of your bonds), and returned so that it is actually received by Globic by 5:00 p.m prevailing Eastern Time on September ___, 2014, at the address set forth on the ballot.

**III.    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

**A.      TREATMENT OF CLAIMS AND INTERESTS**

The Plan contemplates payment of Allowed Claims against the Debtor by utilizing (i) the Cash of the Debtor, (ii) in the event of a Payment Plan, the operations of the Reorganized Debtor, the loans of the Foundation, and deposits and payments of the Residents held by the Debtor, as may be permitted under applicable law, and the Debt Service Reserve Fund (and other funds remaining under the Series 2001 Bonds) solely for purposes provided therein, and (iii) in the event of a Plan Sale, the net proceeds from the Sale of the Community, plus the Debt Service Reserve Fund (and any other funds remaining under the Series 2001 Bonds) solely for the purposes provided therein.  There are no membership or equity interests in the Debtor, as it is a non-profit entity and is not required to have any such interests.

**B.      CLAIMS UNDER THE PLAN**

The following is a summary of the classification and treatment of Claims under the Plan:

| CLASS | TREATMENT |
|---|---|
| **Class 1: Administrative Claims.**<br><br>The Allowed Amount of Administrative Claims is likely to be the amount of RTE's professionals and US Trustee fees, as other claims are being paid in the ordinary course. | Non-Voting.<br><br>Class 1 consists of all Administrative Claims that become Allowed Claims, including, Allowed Claims of the Professional Fees of  Chapter 11 Professionals and the fees payable to the United States Trustee pursuant to 28 U.S.C. 1930(a)(6).  Class 1 also includes all tax claims of governmental units incurred after the Filing Date, all advances to, loans to, or debts incurred by, the Debtor after the Filing Date in the ordinary course of the Debtor's business.<br><br>The Chapter 11 Professionals holding Allowed Class 1 Claims will be paid (a) in cash, in full, on the later of the Effective Date and the Date of |

5

|  | Allowance; or (b) in such amounts and on such terms as agreed upon by the Class 1 Claimant and the Debtor. |
|---|---|
|  | The fees of the United States Trustee will be paid in accordance with 28 U.S.C. 1930(a)(6). |
|  | Any Administrative Claim for any operating expense incurred by, or an advance or loan to the Debtor, in the ordinary course of the operations of the Business of the Debtor, will be paid in full and in cash in the ordinary course of the Debtor's business. |
|  | Any taxes incurred after the Filing Date will be paid in full on the later of (i)  the Effective Date, (ii) the Date of Allowance, and (iii) when ordinarily due and payable. |
|  | Estimated percentage recovery: 100% |
| **Class 2: DIP Claim** The Allowed Amount of the DIP Loan is anticipated to be approximately $600,000, plus an additional $50,000 being advanced by the Foundation immediately prior to the filing to fund Chapter 11 operations. | Non-Voting. 1. Payment Plan. then on the seventh (7th) day after the period for bidding and purchasing ends, the Foundation will receive from the Reorganized Debtor the New Foundation Note.  The New Foundation Note will be non-interest bearing and will provide that, so long as the Reorganized Debtor is in compliance with the 1.20 Debt Service Coverage Ration Requirement (all as defined in the Series 2014 Bond Documents), the Reorganized Debtor shall make annual principal payments to the Foundation under the New Foundation Note on the anniversary of the Effective Date in an amount equal to 33% of the Reorganized Debtor's Excess Days Cash On Hand (as defined in the Series 2014 Bond Documents).  The New Foundation Note shall also provide for a final balloon payment to be made on the New Foundation Note on the anniversary of the Effective Date in 2048.  The New Foundation Note shall be unsecured.  Until the issuance of the New Foundation Note, the DIP Loan will continue to be secured by and perfected against the DIP Loan Collateral, without the need for the filing of any security documents, which DIP Lien will be extinguished upon issuance of the New Foundation Note. 2. Plan Sale. In the event of a Plan Sale, then the Foundation will contribute and waive the balance of the DIP Claim as part of this Plan, above the amount necessary to for the Foundation to have a cash balance of $750,000.  The DIP Loan Collateral will remain as collateral for the DIP Loan until consummation of the Plan Sale, at which time the DIP Lien will attach to the net proceeds of thereof. 3. Notwithstanding the foregoing, the treatment of the DIP Claim hereunder shall not affect the validity of any carve-outs for Allowed Professional Fees under the DIP order, which carve-outs shall remain in place. Estimated percentage recovery:  100% (subject to available cash flow and to certain discounts) |
| **Class 3: Priority Claims** The Allowed Amount of Priority Claims is approximately $0. | Unimpaired.  Not entitled to Vote. 1. Unless the Holder of such claim and the Debtor agree to a different treatment, each holder of an Allowed Priority Claim, if any, shall have |

6

| | its claim Reinstated and paid by the Debtor in the ordinary course of business when ordinarily due and payable. |
|---|---|
| | 2. Debtor's anticipate there will be limited priority claims because most (such as employees) will be paid through first day motions. |
| | Estimated percentage recovery: 100% |
| **Class 4: Series 2001 Bond Claim.** The Allowed Amount of the Series 2001 Bond Claim is $14 million in principal amount, plus interest (which as of May 15, 2014 was $953,930). | Impaired. Entitled to Vote. |

This Plan proposes that each holder of a Class 4 Series 2001 Bond will be paid, in satisfaction of such Class 4 Series 2001 Bond Claim, by one of the following alternative treatments:

1. Payment Plan. In the event that there is no Plan Sale, then on the seventh (7th) day after the period for bidding and purchasing ends, the holders of the Class 4 Series 2001 Bond Claim will receive the Series 2014 Bonds in exchange for and in full satisfaction of their rights under the Series 2001 Bond Documents. The Series 2014 Bonds will provide for (i) principal in the amount of Seven-Million-Five-Hundred-Thousand Dollars ($7,500,000.00) in payments over time; (ii) interest-only payments at an annual rate of 5.0% through 2018; (iii) from 2019 - 2023, interest payments continuing at an annual rate of 5% and amortizing principal payments based on a 30 year amortization to create level annual debt service; and (iv) from 2024 through maturity, interest payments at an annual rate of 8.50% and principal payments based on a 25-year amortization to create level annual debt service. Each holder of a Series 2001 Bond Claim shall be converted into a Series 2014 Bond at the following percentage of 53.6%, so that for each $5,000 of principal amount of such Series 2001 Bond, the holder will receive $2,680 in principal amount of Series 2014 Bonds. No distributions shall be made to the holders of the Class 4 Series 2001 Bond Claim for the balance of any amounts owing under the Series 2001 Bonds other than the exchange for the Series 2014 Bonds.

2. Plan Sale. In the event of a Plan Sale, then upon the consummation of the Plan Sale, the holders of the Class 4 Series 2001 Bond Claim will be paid all of Debtor's Cash plus the net cash proceeds (collectively, the "Sale Proceeds") from the sale of the Community, after payment or escrow (as necessary) for (1) all costs, fees and expenses associated with the Plan Sale of the Community or required to be paid in connection therewith, including without limitation any and all professional, broker, United States Trustee, or related fees and expenses, whether advanced by the Foundation or by the Reorganized Debtor post-Effective Date (collectively, the "Sale Expenses"), (2) after repayment of the Sale Expenses, the Class 2 DIP Claim, in an amount sufficient to ensure that all times from and after the Effective Date the Foundation is holding a cash balance of $750,000, (3) all taxes associated with the Community owed by the Debtor or Reorganized Debtor, including but not limited to, any and all real estate and transfer taxes (if any), and (4) Twenty-Five-Thousand Dollars ($25,000.00) for the Reorganized Debtor's winddown expenses. The Class 4 Series 2001 Bond Claim will also receive any amounts in the Debt Service Reserve Fund (and any other funds under the Series 2001 Bond Documents). The Sale Proceeds and amounts in the Debt Service Reserve Fund (and any other funds under the Series 2001 Bond Documents) will be distributed by the Indenture Trustee to the holders pursuant to and in order of any priorities established by the

| | Series 2001 Bond Documents. In the likely event that the proceeds from the sale of the Property are not sufficient to pay the Class 4 Series 2001 Bond Claim in full, the holders of the Class 4 Series 2001 Bond Claim shall not receive any other distributions under this Plan or from the Debtor or the Reorganized Debtor, including but not limited to any amounts that may be due and owing for accrued and unpaid interest. |
| | Estimated percentage recovery: 40-54% in principal amount |
| **Class 5: Other Secured Claims.** The total estimate of the Allowed Class 5 Claims is *de minimus*. | Unimpaired. Not entitled to Vote.<br><br>    The Allowed Class 5 Other Secured Claims shall be Reinstated and shall be paid by the Reorganized Debtor according to the terms and in the ordinary course of the Debtor and are to be rendered unimpaired pursuant to section 1124(2) of the Bankruptcy Code. |
| **Class 6: Resident Claims** The total estimate of Allowed Class 6 Claims is approximately $5 million, including Entrance Fee Refunds and services due under contracts. | Unimpaired. Not entitled to Vote.<br><br>    Each Allowed Class 6 Resident Claim shall be Reinstated on the Effective Date and shall be paid in the ordinary course of business of the Debtor when such claims become due according to their terms. Any executory contract between the Debtor and a holder of a Class 6 Resident Claim shall be assumed on the Effective Date.<br><br>Estimated percentage recovery: 100% |
| **Class 7: Unsecured Claim of the Foundation** The total estimate of the Allowed Class 7 Claim is approximately $5.5 million. | Impaired. Entitled to Vote.<br><br>    In the event of a Payment Plan, the Class 7 Claim of the Foundation shall not receive any distribution under this Plan. In the event of a Plan Sale, the Class 7 Claim of the Foundation shall be entitled to any proceeds remaining after payment of the Class 1, 2, 3, 4, 5, 6 and 8 Claims in full.<br><br>Estimated percentage recovery: 0% |
| **Class 8: Unsecured Claims.** The total estimate of Unsecured Claims is approximately $70,000.00 | Impaired. Entitled to Vote.<br><br>    The Allowed Class 8 Unsecured Claims shall be paid in equal installments over six (6) months beginning on the 7th day after the period for bidding and closing a sale ends, without interest (and to the extent any Holder of a Class 8 claim asserts a right to interest, the interest portion will be automatically disallowed unless specifically ordered by the Court for that claim). For any claims that are covered by insurance, such as tort or professional liability claims against the Debtor, such claims will first be satisfied from any insurance proceeds, with any remainder to be paid over a six (6) month period with interest.<br><br>Estimated Percentage Recovery: 100% (excluding interest) |

The Debtor is a non-member Indiana non-profit entity, and therefore, there are no Interests in the Debtor to be dealt with in this plan.

The Claims and Claim amounts listed above are amounts estimated by the Debtor as of the filing of this Disclosure Statement and all such Claims are still being reviewed by the Debtor. A listing of Claims or any amounts with respect thereto above or elsewhere in this Disclosure Statement shall not constitute, or be deemed to constitute, allowance of such Claims and all such

8

Claims and amounts are subject, and will remain subject, to challenge and objection by the Debtor and the Reorganized Debtor as provided in the Plan.

## IV.    GENERAL OVERVIEW AND BACKGROUND INFORMATION

## A.    BACKGROUND, GENERAL INFORMATION AND EVENTS LEADING TO THE CHAPTER 11 CASE

### 1.    RTE's History and Operation

RTE is a public benefit corporation under the Indiana Nonprofit Corporation Act, and is a charitable 501(c)(3) organization under the Internal Revenue Code.  RTE is a non-member non-profit, so there is no parent or sponsor organization.  RTE was originally formed in 1971 under the name Caylor-Nickel Medical Center, Inc., to own and operate a hospital.  RTE sold its hospital in 1999, and afterward changed its name to RTE.

In 2001, RTE began building the Community, which was completed and opened for business in 2003.  The Community was built using the proceeds of municipal bonds (the "Series 2001 Bonds") issued by the City of Bluffton, Indiana, and by a $5.7 million equity contribution with cash proceeds remaining from the sale of RTE's hospital.

RTE now exclusively owns and operates the Community.  The Community is located on approximately 38 acres in Bluffton, Indiana.  The Community is a CCRC that includes 44 independent living apartments, 8 independent living cottages, 55 assisted living units that include 14 units dedicated to residents with cognitive impairments, 30 skilled nursing beds, and common areas in one- to three-story buildings.

In addition to the residences and units, the Community includes a number of amenities and recreational spaces for its residents.  These include a wellness center, gift shop, bistro, beauty salon, therapy department, chapel, four resident dining rooms and one private dining room (for special occasions and family events), library, putting green, walking trails, and transportation to activities and medical appointments.

Currently, the community has 120 residents.  As a CCRC, RTE gives residents the opportunity to "age-in-place," so that they can begin their time at the Community in independent living units, and as their needs increase, they can move into assisted living and then to skilled nursing without having to leave the campus and their community of fellow residents and caregivers.

RTE is governed by a five-member Board of Directors consisting of the following individuals:  Michael Rosen, Chairman, Fred Brown, Secretary, Felix Fraraccio, Paul Sanders and Sherry Wheaton.  Daily operations of RTE are under the direction of David Stewart, the Chief Executive Officer, and Nichole Melching, the Executive Director.

The Community is managed by Greystone Management Services Company, LLC ("Greystone" or the "Manager").  Greystone was formed in 1989 and is headquartered in Irving,

9

Texas.  An affiliate of Greystone was the original developer of the Community, and Greystone has managed the Community since opening in 2003.  Greystone serves the senior living industry by providing comprehensive consulting services to existing and potential sponsors and owners of senior living communities.  RTE also has a Shared Services Agreement with Continuums Management Services, LLC, pursuant to which the Community shares in the costs of certain back-office services and the salary of its Chief Executive Officer with certain other non-debtor entities.  Amounts under the Shared Services Agreement are paid by the Foundation in support of RTE, and are not paid from assets of RTE.

RTE employs approximately 73 full-time and 77 part-time employees, and also employs various independent contractors.  The employees are employed and paid through a "co-employer" agreement with Merit Resources, Inc. ("Merit") dated January 10, 2003 (the "Merit Client Agreement").  Pursuant to the Merit Client Agreement, RTE is the worksite employer and Merit is the administrative employer.  Pursuant to the Merit Client Agreement, Merit is responsible for all payroll matters, payment and filing reports for all payroll taxes, maintenance of employee personnel records, payment of applicable insurance premiums, 401K fiduciary requirements, and maintenance of worker compensation insurance.

### 2.    RTE's Capital Structure

As discussed above, the construction of the Community was funded in part by the issuance of certain Series 2001 City of Bluffton, Indiana Revenue Bonds, which were in the original principal amount of $15,985,000.  The Series 2001 Bonds consist of the (i) $9,795,000 in Series 2001A fixed rate bonds with an average interest rate of 6.67% and final maturity in 2027, (ii) $3,490,000 in Series 2001B-1 EXTRAS with an interest rate of 7.00% beginning May 15, 2014 and ending May 14, 2015 and a final maturity in 2031 and (iii) $2,700,000 in Series 2001 B-2 EXTRAS with an interest rate of 7.00% beginning in May 15, 2014 and ending May 14, 2015 and a final maturity in 2032.

The Series 2001 Bonds were issued and secured under the Bond Trust Indenture dated as of December 15, 2001 (the "Trust Indenture") between the City of Bluffton, Indiana ("Issuer") and The Bank of New York Mellon Trust Company, N.A., as successor to Bank One Trust Company, National Association, as trustee (the "Indenture Trustee").  The Series 2001 Bonds are pass-through municipal financing, so that all obligations owed to the bondholders are due from RTE, and are non-recourse to the Issuer.  The Series 2001 Bonds are further evidenced in a Loan Agreement (the "Loan Agreement") and Master Notes corresponding to each series of Series 2001 Bonds (respectively, the "Series 2001A Master Note", the "Series 2001B-1 Master Note" and the "Series 2001B-2 Master Note" and collectively, the "Master Notes"), pursuant to the Master Trust Indenture dated as of December 15, 2001, as supplemented and amended (the "Master Indenture") between RTE, the Issuer as applicable, and the Indenture Trustee.  Collectively, all of the documents evidencing the Series 2001 Bonds, including the Trust Indenture, the Loan Agreement, the Master Notes, the Master Indenture, all mortgages, security agreements, and other related documents, are referred to as the "Series 2001 Bond Documents".

The proceeds of the Series 2001 Bonds were loaned to RTE to (i) finance the acquisition, construction, installation and equipping of the Community, (ii) fund a debt service reserve fund

to secure the payment of principal of and interest on the Series 2001 Bonds, (iii) pay a portion of interest on the Series 2001 Bonds during the construction of the Project and (iv) pay a portion of the costs of issuance of the Series 2001 Bonds.

Currently, the obligations owed under the Series 2001 Bonds are approximately $14,000,000.00 in remaining principal amount, plus pre-petition interest (the "Obligations"). All Obligations under the Series 2001 Bonds are believed to be secured equally and ratably by a mortgage lien on and security interest in substantially all real and personal property of RTE, including without limitation, the Community. The alleged liens and security interests are asserted by the Indenture Trustee against RTE's pre-petition assets (the "Series 2001 Bond Collateral") and are referred to as the "Series 2001 Bond Lien."  RTE has few if any other secured creditors; its only other significant secured creditor is believed to be the bank that loaned the money for RTE's campus van.

RTE is the holder of the nominal membership interests in two additional Indiana non-profit entities, the Foundation and the Alzheimer's Disease Foundation, Inc. ("ALZ"). Neither is obligated for RTE's debts. The Foundation originally provided a $500,000 liquidity support agreement related to the Series 2001 Bonds, which was fully utilized early in the financing and is no longer in place.  Nevertheless, the Foundation has historically provided subordinated loans to RTE to enable RTE to operate and to make payments on the Series 2001 Bonds.  RTE owes the Foundation approximately $5.5 million as of the filing of this Bankruptcy Case.  ALZ has limited income, and has typically supported RTE's mission of providing care to senior citizens with Alzheimer's disease, but ALZ is not required to support RTE or the Community, and it has no relationship to the Series 2001 Bonds.

### 3.    RTE's Financial Struggles and Change in Management

Like many CCRC's built in the 2000's, the Community struggled financially.  RTE began looking for a new organization to take over operations due to its financial difficulties. In 2009 in the midst of The Great Recession, RTE brought on new board members and its current management team, who hoped to effectuate a turnaround of the Community.

Since that time, RTE has made progress but has been unable to achieve a sustaining occupancy level that would support both its operations and the annual debt service on the Series 2001 Bonds.  This is due in part to the relatively small market in Wells County, Indiana and the surrounding area, and in part because of the Community's fee structure.  RTE has operated under the traditional CCRC "entrance fee" model, in which residents pay a large entrance fee in order to live in the Community, with part of the fee being refundable after the resident dies or leaves the community and the unit is re-sold.  In an effort to improve occupancy, RTE in the last year has converted to a "rental fee" model, so that new residents pay a community fee of approximately $25,000 to live in the community.  The community fee is not refundable after moving out, so that over time (about seven-to-eight years for the full conversion to occur), RTE will satisfy all of is refund obligations to residents and will no longer owe refunds in the future.

For month ending June 30, 2014, occupancy for independent living units ("ILU") was at 69% (36/52), occupancy for assisted living units ("ALU") was 77% (31/41), occupancy for

memory support units ("MSU") was 99% (13.8/14) and occupancy for skilled nursing beds ("SN") was 94% (28.3/30).

As of December 31, 2013 RTE's annual revenue was approximately $5,801,568, and operating expenses were approximately $5,221,524.

### 4.    RTE's Decision to seek Bankruptcy Protection

RTE is unable to generate enough cash from operations to pay its operating expenses and its debt service on the Series 2001 Bonds. Due to its financial difficulties, RTE has not made the payments for the Series 2001 Bonds that were due in May 2013, November 2013, and May 2014. RTE believes that the Indenture Trustee used certain monies in the Debt Service Reserve Fund to pay the amounts due to bondholders for at least the May 2013 bond payment.

There are approximately 1,400 Bondholders of the Series 2001 Bonds. As a result, the _only_ means for RTE to accomplish a restructuring of the Series 2001 Bonds is through a Chapter 11 reorganization. In addition, because RTE is a CCRC, it falls within the regulatory oversight of the Indiana Securities Division, which sometimes has responsibility for repayment of resident entrance fee obligations where a CCRC has financial troubles. One option available to the Securities Division would be appointment of a receiver for the Community. RTE believes that a receivership would likely result in a sale of the Community after a substantial delay and at a depressed sale price.

This Chapter 11 case is intended to enable the Community to emerge financially stronger and to continue to provide the high standard of services, care, and amenities the residents and future residents have come to expect. RTE has filed the Plan and this disclosure statement on the first day because RTE is committed to the quick resolution of its financial difficulties and emergence from bankruptcy with the best possible outcome for RTE's residents, the Bondholders, and other creditors.

The Plan ensures that RTE's residents, who are RTE's revenue source for repaying the bondholders, will be able to remain in the Community and all obligations to residents will be paid by RTE in the ordinary course of business. Any other result could result in destabilizing the Community. RTE further believes that a receivership would likely have resulted in a sale of the Community after a substantial delay and at a depressed sale price. RTE believes that the highest recovery available to the Bondholders (and all stakeholders) is through the Plan, which proposes that the Bondholders get the best of either a payment plan over time or a controlled sale.

Accordingly, RTE filed for relief under Chapter 11.

## B.    SIGNIFICANT POST-PETITION EVENTS

On July 15, 2014 (the "Petition Date"), RTE filed for relief under Chapter 11 of the Bankruptcy Code. RTE continues to own and operate the Community as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

0127241.0608061   4826-2605-2124v10

1.      **Continuation of Business; Stay of Litigation**

Following the Petition Date, RTE has continued to operate as debtor-in-possession with the protection of the Bankruptcy Court.  The Bankruptcy Court has certain supervisory powers over RTE's operations during the pendency of the Chapter 11 Case, including the power to approve any transactions that are outside the ordinary course of RTE's business.

An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all litigation against RTE.  This automatic stay will remain in effect until the Effective Date unless modified or lifted by order of the Bankruptcy Court.

2.      **Major Pleadings in the Case**

Following the filing of the petition, the Debtor filed, among other pleadings, the following pleadings and the Bankruptcy Court granted the respective orders on such motions:

A.      **Motion of the Debtor for Entry of Interim and Final Orders (i) Authorizing the Use of Cash Collateral; (ii) Approving Adequate Protection and (iii) Scheduling a Final Hearing**

This motion (the "CC Motion") sought permission to use RTE's cash and proceeds of its accounts receivable, which were allegedly encumbered by a lien in favor of the Indenture Trustee.  The Court granted the CC Motion on _____.

B.      **Motion of the Debtor for Interim and Final Orders (i) Authorizing Debtor to Obtain Post-Petition Financing; (ii) Granting Liens and Superpriority Claims, and (iii) Scheduling Final Hearing on Debtor's Motion to Incur Such Financing on a Permanent Basis**

This motion (the "DIP Motion") sought permission for RTE to borrow up to $600,000 from the Foundation in order to pay for RTE's operations and expenses during the case. The Motion was granted on _____.

C.      **Motion of Debtor for an Order (i) Approving Continued Use of Existing Cash Management System, (ii) Authorizing Use of Prepetition Bank Accounts and Business Forms, and (iii) Waiving Certain Requirements of the United States Trustee**

This motion (the "Cash Management Motion") sought permission to continue using RTE's existing bank accounts, waivers of certain bonding requirements specific to bankruptcy, and permission for RTE to continue giving residents access to their discretionary funds placed with RTE in a Resident Trust Fund Account.  The Court granted the Cash Management Motion on _____.

D.      **Motion of the Debtor for Order (i) Authorizing, but Not Directing, the Debtor to Pay Prepetition Employee Wages, Salaries, and Related Items, (ii) Prepetition**

13

**Employee Business Expenses, (iii) Prepetition Contributions to and Benefits Under Employee Benefit Plans, (iv) Prepetition Employee Payroll Deductions and Withholdings, (v) Workers' Compensation Premiums, and (vi) All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (vii) Authorizing and Directing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtor Relating to the Foregoing**

This motion (the "Wages Motion") sought permission to pay amounts owed to RTE's employees which had accrued pre-petition and would be payable post-petition, in order to ensure continuity in RTE's operations and that employees did not leave.  The Court granted the Wages Motion on _____.

E.    **Application authorizing the Debtor to employ and retain Globic Advisors as notice and solicitation agent, *nunc pro tunc* as of the Petition Date**

This motion (the "Globic Retention") sought permission for RTE to hire Globic Advisors in order to handle the solicitation of the Plan, including the approximately 1,400 Bondholders believed to be holding Bonds.  In addition, the motion sought permission to have Globic act as the sole noticing agent for notices to Residents in order to protect their personal health information pursuant to HIPAA.  The Court granted the Globic Retention on _____.

F.    **Motion of the Debtor for No Appointment of Healthcare Ombudsman**

This motion (the "Ombudsman Motion") sought relief from requirement that the Court appoint a Patient Care Ombudsman in connection with a healthcare bankruptcy, since RTE has a strong track record of high quality resident care and since resident care issues were not one of the precipitating factors in this bankruptcy filing.  The Court granted the Ombudsman Motion on _____.

G.    **Motion of the Debtor for Entry of an Order (i) Fixing a Bar Date for Filing Proofs of Claim or Interest Pursuant to Bankruptcy Rule 3003(C)(3), (ii) Approving Proof of Claim Form and (iii) Approving the Form and Manner of Notice of Bar Date**

This motion (the "Bar Date Motion") sought to set a bar date for the filing of claims against RTE in the bankruptcy.  Certain types of claims were excluded from the requirement, including most Resident claims (except for tort claims or a Resident receiving specific notice of a dispute as to their anticipate claim).  The Court granted the Bar Date Motion on _____.

H.    **Expedited First Day Motion of Debtor for Entry of an Order Authorizing Debtor to Honor Claims Relating to Resident Entrance Fees, Escrow Agreements, and Move-In Deposits**

This motion (the "Resident Motion") sought permission from the Court to allow RTE to honor its obligations to Residents for Entrance Fee Deposit Refunds and Move-In

14

Deposits in the ordinary course during the bankruptcy.  Further, the Resident Motion sought permission for RTE to extend the decision date (the "Trigger Date") under certain Escrow Agreements entered with Residents starting in late 2013 through which Residents had moved into the Community and paid their entrance fees into escrow; extending the Trigger Date allowed the new Residents more time to make a decision so that they did not risk forfeiting their deposit if they failed to move out within 60 days after the bankruptcy filing.  The Court granted the Resident Motion on _____.

I.    **Motion for Entry of an Order to Set Noticing, Case Management, and HIPAA Information Procedures**

This motion (the "Case Management Motion") set specific procedures for sending notices to parties electronically, limiting the number of parties having to receive every filing if it was unlikely to pertain to them specifically, and protecting resident information under HIPAA when sending notices and filing bankruptcy documents.   The Court granted the Case Management Motion on _____.

J.    **Motion For Entry of an Order under 11 U.S.C. §§ 105(A) And 366 (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service to, or Discriminating Against, the Debtor, (ii) Approving the Proposed Adequate Assurance of Payment, and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance of Payment**

This motion (the "Utilities Motion") provided for deposits for utilities and a procedure for utilities to request additional protection during the bankruptcy in order to prevent any utility services from being terminated or limited during the bankruptcy.  The Utilities Motion was granted by the Court on _____.

K.    **Motion of Debtor for Order Authorizing the Assumption of Executory Contract with Merit Resources, Inc.**

This motion (the "Merit Assumption") requested approval from the Court to allow RTE to assume its agreement with Merit Resources regarding co-employment of RTE's employees, and the provision of certain administrative services by Merit.  The Merit Assumption was granted by the Court on _____.

L.    **Motion of the Debtor for Order Authorizing the Assumption of Executory Contract with Greystone Management Services Company**

This motion (the "Greystone Assumption") requested approval from the Court to allow RTE to assume its month-to-month management agreement with Greystone Management Services Company, to assure continuity of management during the case.  The Greystone Assumption was granted by the Court on _____>

M.    **Motion for Order Authorizing Insurance Premium Financing**

15

This motion (the "Insurance Financing Motion") requested approval from the Court to allow RTE to continue its ordinary practice of financing its insurance premiums under certain insurance policies. The Insurance Financing Motion was granted by the Court on _____.

**N.    Retention Orders**

RTE filed applications to retain Frost Brown Todd LLC as bankruptcy counsel; North Shores Consulting LLC as its financial advisor; Ice Miller LLP as bond counsel for the issuance of the Series 2014 Bonds; and _____ as its real estate broker for the marketing and sale of the Community.   The applications were granted on _____, ___, _____, and _____, respectively.

# V.    VALUATION

RTE has received an appraisal from an independent M.A.I. appraiser indicating that the Community has a value of approximately $4.7 million as of April 1, 2014.  In addition to the value of the Property, the value of the accounts receivable and cash on hand are estimated at approximately $290,000.00 (net of uncollectibles) at any time, for a total value of the Assets of approximately $4,990,000.00. The Indenture Trustee is believed to have a lien on substantially all of the Assets. With respect to the value of avoidance claims under Section 5 of the Bankruptcy Code, RTE was current on all or virtually all of its obligations prior to the Petition Date and accordingly, RTE does not believe that there are any section 547 or 548 claims of any positive value over and above the costs of pursuing same.

# VI.    THE PLAN

RTE has proposed the Plan and believes that the classification and treatment of Claims provided for in the Plan are consistent with the requirements of the Bankruptcy Code.  Under the Bankruptcy Code, holders of Allowed Claims against RTE that are Impaired and that receive distributions under the Plan are entitled to vote on the Plan.  A summary of the classification and treatment of Claims and Interests under the Plan is set forth above in this Disclosure Statement.

## A.    TIMELINE TO UNDERSTAND DETERMINATION OF OUTCOME AS A PAYMENT PLAN OR PLAN SALE

The Plan uses a number of defined terms, and for ease of reference by the reader, the Debtor provides this timeline to show when certain events are anticipated to happen.  All defined terms are set out in the Plan, and the reader is directed to the Plan for any terms not specifically included in this Disclosure Statement.  The dates here are simply are reference guidelines, and are not binding on the Debtor or any other party, and are subject to change.

16

| Event | When |
|-------|------|
| Effective Date – the date after approval of the Plan by the Bankruptcy Court on which the Plan goes into effect. | Currently, the Plan provides that October 22, 2014 is the outside deadline for occurrence of the Effective Date, which may be extended by Debtor in its sole discretion. |
| Bid Deadline – the date on which bids are due from any interested buyers of the property. | Seven (7) days after the Effective Date |
| Date of any auction – if more than one conforming bid is received by the Bid Deadline, then the Reorganized Debtor will hold an auction. | Fourteen (14) days after the Bid Deadline |
| Sale Period Expiration Date | |
| ▪ If there are no conforming bids submitted by the Effective Date | One (1) day after the Bid Deadline |
| ▪ If there is at least one conforming bid submitted by the Effective Date | Forty-Two (42) days after the Effective Date |
| Issuance of the Series 2014 Bonds if there is no Plan Sale | Seven (7) days after the Sale Period Expiration Date |

## B.    TREATMENT OF CLAIMS UNDER THE PLAN

The Plan provides for the payment of Claims against the Debtor.

**1.    Class 1 (Non-Voting):  Administrative Claims.**

(i)    The Chapter 11 Professionals holding Allowed Class 1 Claims will be paid (a) in cash, in full, on the later of the Effective Date and the Date of Allowance; or (b) in such amounts and on such terms as agreed upon by the Class 1 Claimant and the Debtor. The fees of the United States Trustee will be paid in accordance with 28 U.S.C. 1930(a)(b).

(ii)    Any Administrative Claim for any operating expense incurred by, or an advance or loan to the Debtor, in the ordinary course of the operations of the business of the Debtor, will be paid in full and in cash in the ordinary course of the Debtor's business.

(iii)    Any taxes incurred after the Filing Date will be paid in full on the later of (i) the Effective Date, (ii) the Date of Allowance, and (iii) when ordinarily due and payable.

**2.    Class 2 (Non-Voting):  DIP Claim.**  Unless the Foundation and the Debtor agree to a less favorable treatment in writing, the DIP Claim will be repaid (i) in the event of a

17

Payment Plan, to the extent of excess cash flow under the New Foundation Note, and (ii) in the event of a Plan Sale, from the proceeds of the Sale of the Property, in an amount sufficient such that the Foundation holds a cash balance of $750,000 after the repayment.

(a)    Payment Plan.  In the event there is no Plan Sale, then on the seventh (7th) day following the Sale Period Expiration Date, the Foundation will receive from the Reorganized Debtor the New Foundation Note.  The New Foundation Note will be non-interest bearing and will provide that, so long as the Reorganized Debtor is in compliance with the 1.20 Debt Service Coverage Ration Requirement (all as defined in the Series 2014 Bond Documents), the Reorganized Debtor shall make annual principal payments to the Foundation under the New Foundation Note on the anniversary of the Effective Date in an amount equal to 33% of the Reorganized Debtor's Excess Days Cash On Hand (as defined in the Series 2014 Bond Documents).  The New Foundation Note shall also provide for a final balloon payment to be made on the New Foundation Note on the anniversary of the Effective Date in 2048.  The New Foundation Note shall be unsecured.  Until the issuance of the New Foundation Note, the DIP Loan will continue to be secured by and perfected against the DIP Loan Collateral, without the need for the filing of any security documents, which DIP Lien will be extinguished upon issuance of the New Foundation Note.

(b)    Plan Sale.  In the event of a Plan Sale, then the Foundation will contribute and waive the balance of the DIP Claim as part of this Plan, above the amount necessary to for the Foundation to have a cash balance of $750,000.  The DIP Loan Collateral will remain as collateral for the DIP Loan until consummation of the Plan Sale, at which time the DIP Lien will attach to the net proceeds thereof.

(c)    Carve-Outs.  Notwithstanding the foregoing, the treatment of the DIP Claim hereunder shall not affect the validity of any carve-outs for Allowed Professional Fees under the DIP order, which carve-outs shall remain in place.

3.    **Class 3:  Priority Claims.**

(a)    <u>Treatment</u>.  Unless the Holder of such claim and the Debtor agree to less favorable treatment, each holder of an Allowed Priority Claim, if any, shall have its claim Reinstated and paid by the Debtor in the ordinary course of business when ordinarily due and payable.

(b)    <u>Impairment</u>.  Class 3 is Unimpaired by this Plan.  The Class 3 Claimants will be deemed to accept this Plan, and will not have the right to vote to accept or reject this plan.

4.    **Class 4:  Series 2001 Bond Claim.**

(a)    <u>Treatment</u>.  This plan proposes that each holder of a Class 4 Series 2001 Bond will be paid, in full satisfaction of such Class 4 Series 2001 Bond Claim, by one of the following alternative treatments:

18

     (i)    <u>Payment Plan</u>.  In the event that there is no Plan Sale, then on the seventh (7th) day after the Sale Period Expiration Date, the holders of the Class 4 Series 2001 Bond Claim will receive the Series 2014 Bonds in exchange for and in full satisfaction of their rights under the Series 2001 Bond Documents.  The Series 2014 Bonds will provide for (i) principal in the amount of Seven-Million-Five-Hundred-Thousand Dollars ($7,500,000.00) in payments over time; (ii) interest-only payments at an annual rate of 5.0% through 2018; (iii) from 2019 - 2023, interest payments continuing at an annual rate of 5% and amortizing principal payments based on a 30-year amortization to create level annual debt service; and (iv) from 2024 through maturity, interest payments at an annual rate of 8.50% and principal payments based on a 25-year amortization to create level annual debt service.   The payment schedule for the Class 4 Series 2001 Bond Claim is attached hereto as <u>Exhibit P-1</u>.

     (1)    As of the Petition Date, the total amount owing under the Series 2001 Bonds was $14,000,000 principal plus $953,930 interest through May 15, 2014.  Each holder of a Series 2001 Bond Claim shall be converted into a Series 2014 Bond at the following percentage of 53.6%, so that for each $5,000 of principal amount of such Series 2001 Bond, the holder will receive $2,680 in principal amount of Series 2014 Bonds.

     (2)    The Series 2014 Bonds will be secured in the same manner as the Series 2001 Bonds in all of the Series 2001 Bond Collateral, and until the issuance of the Series 2014 Bonds, the Series 2001 Bond Lien will remain in place.  The terms of the Series 2014 Bonds will be set out in the Series 2014 Bond Documents which will be provided in the Plan Supplement, and will include (a) the requirement of distribution of the proceeds of the Series 2014 Bonds ratably to all holders, (b) continuation of the Debt Service Reserve Fund (and any other funds under the Series 2001 Bond Documents still in place presently) but only to the extent of any funds located therein and not to exceed maximum annual debt service in the years 2019 – 2023 with any excess being used to pay interest in 2015, (c) the right to prepayment at any time without premium or penalty, (d) the right of the Community to enter into one or more bed lease agreements with hospitals without the need for additional consent, subject to the lien of the Series 2014 Bonds, and (e) voting provisions so that any future amendments to the bond documents may be handled by votes of a majority in number and more than 2/3[rd]'s in amount of those voting subject to any reissuance requirements. The financial covenants for the Series 2014 Bonds will remain generally the same as for the Series 2001 Bonds with the exception of the Liquidity Covenant which will be reduced from 200 Days Cash on Hand to 40 Days Cash on Hand in 2015, 50 Days Cash on Hand in 2016, and 60 Days Cash on Hand in 2017 and each year thereafter.

     (3)    No distributions shall be made to the holders of the Class 4 Series 2001 Bond Claim for the balance of any amounts owing under the Series 2001 Bonds other than the exchange for the Series 2014 Bonds.

     (ii)    Plan Sale.  In the event of a Plan Sale, then upon the consummation of the Plan Sale, the holders of the Class 4 Series 2001 Bond Claim will be paid all of Debtor's Cash plus the net cash proceeds (collectively, the "Sale Proceeds") from the sale of the Community, after payment or escrow (as necessary) for (1) all costs, fees and expenses associated with the Plan Sale of the Community or required to be paid in connection therewith,

19

including without limitation any and all professional, broker, United States Trustee, or related fees and expenses, whether advanced by the Foundation or by the Reorganized Debtor post-Effective Date (collectively, the "Sale Expenses"), (2) after repayment of the Sale Expenses, the Class 2 DIP Claim, in an amount sufficient to ensure that all times from and after the Effective Date the Foundation is holding a cash balance of $750,000, (3) all taxes associated with the Community owed by the Debtor or Reorganized Debtor, including but not limited to, any and all real estate and transfer taxes (if any), and (4) Twenty-Five-Thousand Dollars ($25,000.00) for the Reorganized Debtor's winddown expenses.   The Class 4 Series 2001 Bond Claim will also receive any amounts in the Debt Service Reserve Fund (and any other funds under the Series 2001 Bond Documents).  The Sale Proceeds and amounts in the Debt Service Reserve Fund (and any other funds under the Series 2001 Bond Documents) will be distributed by the Indenture Trustee to the holders pursuant to and in order of any priorities established by the Series 2001 Bond Documents.  In the likely event that the proceeds from the sale of the Property are not sufficient to pay the Class 4 Series 2001 Bond Claim in full, the holders of the Class 4 Series 2001 Bond Claim shall not receive any other distributions under this Plan or from the Debtor or the Reorganized Debtor, including but not limited to any amounts that may be due and owing for accrued and unpaid interest. The Series 2001 Bond Collateral will remain as collateral for the Series 2001 Bond Claim until consummation of the Plan Sale, at which time the Series 2001 Bond Lien will attach to the net proceeds of thereof.

        (iii)    Impairment.  The Class 4 Claim is impaired.  Therefore, the beneficial holders of the Class 4 Series 2001 Bonds shall be entitled to vote to accept or reject this Plan.

**5.    Class 5:  Other Secured Claims.**

        (a)    <u>Treatment</u>.   The Allowed Class 5 Other Secured Claims shall be Reinstated and shall be paid by the Reorganized Debtor according to the terms and in the ordinary course of the Debtor and are to be rendered unimpaired pursuant to section 1124(2) of the Bankruptcy Code.

        (b)    <u>Impairment</u>.  The Class 5 Other Secured Claims are not Impaired.  Therefore, the Class 5 Claimants will be deemed to have accepted this Plan, and will not have the right to vote to accept or reject this Plan.

**6.    Class 6:  Resident Claims.**

        (a)    <u>Treatment</u>.   Each Allowed Class 6 Resident Claim shall be Reinstated on the Effective Date and shall be paid in the ordinary course of business of the Debtor when such claims become due according to their terms.  Any executory contract between the Debtor and a holder of a Class 6 Resident Claim shall be assumed on the Effective Date.

        (b)    <u>Impairment</u>.  The Class 6 Resident Claims are not Impaired.  Therefore, the Class 6 Claimants will be deemed to have accepted this Plan, and will not have the right to vote to accept or reject this Plan.

20

7.    **Class 7:  Unsecured Claim of the Foundation.**

(a)    <u>Treatment</u>.  As of the Petition Date, the Debtor was indebted to the Foundation in the amount of approximately $5.5 million.  In the event of a Plan Sale, the Class 7 Unsecured Claim of the Foundation shall be entitled to any proceeds remaining after payment of the Class 1, 2, 3, 4, 5, 6 and 8 Claims in full. If there is no sale of the Property, then the Class 7 General Unsecured Claim of the Foundation shall not receive any distribution under this Plan.

(b)    <u>Impairment</u>.  The Class 7 Claim is impaired.  The holder of the Class 7 Claim shall be entitled to vote to accept or reject this Plan.  However, as the Foundation is an insider affiliate of the Debtor, its vote shall not be counted for purposes of Section 1129 of the Bankruptcy Code.

8.    **Class 8:  Unsecured Claims.**

(a)    <u>Treatment</u>.  Unless the Holder of such Claim and the Debtor agree to less favorable treatment, the Allowed Class 8 Unsecured Claims shall be paid in equal installments over six (6) months beginning on the Sale Period Expiration Date  without interest (and to the extent any Holder of a Class 8 claim asserts a right to interest, the portion for interest will be automatically disallowed unless specifically ordered by the Court for that claim).  For any claims that are covered by insurance, such as tort or professional liability claims against the Debtor, such claims will first be satisfied from any insurance proceeds, with any remainder to be paid over a six (6) month period without interest.

(b)    <u>Impairment</u>.  Class 8 Claims are Impaired.  The Class 8 Claimants are entitled to vote to accept or reject this Plan.

## C.    MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

1.    **Implementation**

The Plan will be implemented as follows: From and after the Effective Date, the Reorganized Debtor shall continue to exist as a nonprofit corporation in accordance with applicable Indiana law pursuant to its organizational documents in effect prior to the Effective Date.  All property of the Debtor, including all claims, rights, and causes of action and any property acquired by the Debtor under or in connection with this Plan, shall remain in the Estate until the Sale Period Expiration Date, at which time all property shall re-vest in the Reorganized Debtor free and clear of all Claims, liens, charges, encumbrances, and Interests, except for the liens, claims, encumbrances, and interests of the Series 2001 Bonds against the Series 2001 Bond Collateral; provided, however,  in the event of a Plan Sale, then the property re-vesting in the Reorganized Debtor shall only be property which was not sold in the Plan Sale or yet paid to the bondholders.

On and after the Effective Date, the Reorganized Debtor may operate the Business in the ordinary course subject only to this Plan and section 363 the Bankruptcy Code, and following the Sale Period Expiration Date,  may use, acquire, and dispose of property and compromise or settle

0127241.0608061   4826-2605-2124v10

any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, any Plan Sale of the Property by the Reorganized Debtor which occurs after the Effective Date shall be a sale pursuant to the provisions of the Bankruptcy Code, including but not limited to, Section 363, Section 365 and Section 1146.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

   (a) *Payment Plan*.  On the Effective Date, the Debtor shall enter into the Series 2014 Bond Documents and the New Foundation Note, all of which will be held in escrow pending the Sale Period Expiration Date.  If there is no Plan Sale, then the escrowed documents will effectuate the Debtor's financial restructuring and provide the Reorganized Debtor with a viable capital structure going forward in order to make payments to the bondholders and the Reorganized Debtor's creditors, and will be released from escrow and take effect on the seventh (7th) day following the Sale Period Expiration Date.  All of the liens, claims, interests and mortgages securing the Series 2001 Bonds and the DIP Loan shall stay in place from the Effective Date until the Sale Period Expiration Date and the release from escrow of the Series 2014 Bond Documents and the New Foundation Note, at which time the Series 2014 Bond Documents and the New Foundation Note shall take effect.  The Series 2014 Bond Documents shall be secured by liens, claims, and mortgages pursuant thereto which shall be in substantially the same scope and form as those which secured the Series 2001 Bond Documents.  The New Foundation Note will be unsecured, and the Foundation will advance Exit Financing in an amount of up to $500,000 to the Reorganized Debtor from the available funds of the Foundation for the operating needs of the Reorganized Debtor, with the repayment of the Exit Financing to be incorporated into the New Foundation Note on the same terms and conditions.

   (b) *Plan Sale*.  Beginning with the filing of the Bankruptcy, the Debtor and Reorganized Debtor will market the Property through a broker, and such marketing will continue through the Bid Date.   Any prospective buyers must submit a binding, conforming bid to the Reorganized Debtor so that it is received by 5:00 p.m. prevailing Eastern Time on the Bid Date and the sale must be consummated prior to the Sale Period Expiration Date.  In the event that the Reorganized Debtor receives only one conforming bid, the Reorganized Debtor will proceed with the consummation of a Plan Sale of the Community to the prospective buyer prior to the Sale Period Expiration Date.  In the event that the Reorganized Debtor receives more than one conforming bid, the Reorganized Debtor will hold an auction to determine the winning Bidder within fourteen (14) days after the Bid Date and held at the offices of counsel for the Reorganized Debtor, 201 North Illinois Street, Suite 1900, Indianapolis, Indiana 46204 pursuant to a notice provided by the Reorganized Debtor to all Bidders and the Indenture Trustee.  The Reorganized Debtor and the winning Bidder with the highest and best Bid submitted at the conclusion of the auction will proceed with the consummation of a Plan Sale of the Community prior to the Sale Period Expiration Date.

    (i) The Debtor and Reorganized Debtor shall retain a broker to market the Community of the Debtor and to solicit Bids. Subject to a potential Bidder entering into a

22

confidentiality agreement satisfactory to the Debtor in its business judgment, the Debtor will afford any potential Bidder the opportunity to conduct a reasonable due diligence review.

(ii)    The minimum bid (the "Minimum Bid") required to be submitted by a Bidder to acquire the Community of the Reorganized Debtor shall be: (i) a cash purchase price in an amount of not less than Six-Million-Dollars ($6,000,000.00) to be paid at closing without hold-back, escrow, or earn-out (the "Base Cash Price"); (ii) assumption by the Bidder of the obligations owing by the Reorganized Debtor under this Plan to the holders of the Class 6 Resident Claims; (iii) assumption by the Bidder of any obligations Reinstated under this Plan, (iv) acceptance of assignment of any contracts or leases assumed under the Plan (with the exception of Insurance Policies, at the Reorganized Debtor's option in its sole discretion), and payment or reimbursement of all cure payments required to be paid or previously paid; (iv) assumption of the Class 8 Unsecured Claims and any unpaid ordinary course of business operating expenses of the Reorganized Debtor incurred by the Reorganized Debtor from and after the Effective Date that are owing at the closing of the Plan Sale; and (v) additional cash in an amount equal to 90% of the accounts receivable outstanding on the Reorganized Debtor's books (the "Accounts Receivable Price") as of three (3) Business days before closing of the Plan Sale, net of Debtor's reasonable reductions for bad debt.

(iii)    The Reorganized Debtor may consider any conforming bid from a financially-capable Bidder deemed qualified by the Reorganized Debtor, in its reasonable business judgment and sole discretion, to acquire the Community of the Reorganized Debtor.  To be conforming, a Bid shall meet a number of requirements, each as set out in Section 5.3 of the Plan.

(iv)    The Reorganized Debtor shall have the right to evaluate any Bid, to make inquiries concerning the obligations and representations contained therein, including, without limitation, the right to make inquiries of financial institutions provided as evidence of the Bidder's ability to close the transaction contemplated by the Bid, and to determine whether the Bidder is capable of consummating the transaction contemplated by the Bid.  Any Bidder submitting a conforming bid and meeting the requirements set out above and in the Plan Supplement will be allowed to participate in the auction. Any disputes regarding the conformity of any Bid, or regarding the highest and best bid at any auction, shall be submitted to the Bankruptcy Court for resolution if necessary.  The Bankruptcy Court may also enter a sale order if required by the parties.

(v)    If a Plan Sale closes, the proceeds shall be paid so that the Class 4 Series Bond Claim is treated as provided for in a Plan Sale.  If no Bid is received by the Bid Date, or if no Plan Sale closed by the Sale Period Expiration Date, there shall be no auction and no Plan Sale and the Class 4 Series 2001 Bond Claim shall be treated as provided for in the Payment Plan.

## 2.    Cancellation of Lien, Encumbrances and Charges.

On the Effective Date, any and all liens, indentures, security interests, encumbrances and charges against the Property, the Operating Assets, and the Assets shall be released and

23

cancelled, except for (i) the Series 2001 Bond Lien, or, upon exchange, the Series 2014 Bond Lien, (ii) the DIP Lien, (iii) any lien for Class 5 Other Secured Claims; and (iv) any carve-outs.

### 3.    Authorization to Execute and Deliver Restructuring Documents.

On the Effective Date, without any requirement of further action of the Debtor or Reorganized Debtor, the Reorganized Debtor shall be authorized and directed to execute and deliver into escrow the Series 2014 Bond Documents (including all mortgages, security documents and other related agreements, documents or instruments to be executed or delivered in connection therewith and constituting part thereof), and the New Foundation Note.

(a)    Upon the seventh (7th) day following the Sale Period Expiration Date, if there has been no Plan Sale, then the foregoing documents shall be released from escrow and shall constitute the legal, valid and binding obligations of the Reorganized Debtor, enforceable in accordance with their respective terms.  The liens securing the obligations of the Reorganized Debtor under the Series 2014 Bond Documents shall constitute legal, valid, perfected, non-avoidable and binding liens on, and security interests in, the assets of the Reorganized Debtor to the extent set forth in the Series 2014 Bond Documents.  No obligation, payment, transfer or grant of security under the Restructuring Documents shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim.  The Reorganized Debtor shall be authorized and directed to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence the perfection of such liens and security interests under the provisions or any applicable federal, state, provincial or other law (whether domestic or foreign) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

(b)    In the event of a Plan Sale, the Series 2014 Bond Documents and the New Foundation Note shall not be released from escrow, and instead shall be cancelled and never take effect.

24

4.      **Sources of Cash for Plan Distributions**.

All cash and/or funds necessary for Reorganized Debtor to make payments pursuant to this Plan shall be obtained from Cash of the Debtor, net proceeds from the Sale of the Property and the Operating Assets in the event of a Plan Sale, the operations of the Reorganized Debtor, the contributions and/or loans and/or advances of the Foundation, and deposits and payments of the Residents held by the Debtor, as may be permitted under applicable law.  Further, the Debt Service Reserve Fund (and any other funds remaining under the Series 2001 Bonds) shall be used solely for payment of, and in accordance with, the Series 2001 Bonds and the Series 2014 Bonds with which they are replaced.

5.      **Corporate Dissolution Following Consummation of a Sale**.

Following consummation of a Plan Sale as provided herein, upon satisfaction by the Debtor of its obligations under the Bidder Asset Purchase Agreement, the Debtor shall have no further duties and shall be deemed dissolved and terminated immediately upon the filing of Articles of Dissolution, without the need for any further actions or approvals by any party or authority, and membership interests in any affiliate or subsidiary non-profit entities shall be deemed surrendered and extinguished to such entities so that they may subsequently become non-member non-profit entities.

## D.      DISCHARGE, RELEASES AND INJUNCTIONS

1.      **Discharge.**

Except as otherwise specifically provided by the Plan on the Effective Date, the Debtor, its successors and assigns, and their respective assets and properties and the Assets will be discharged and released from any debt, charge, liability, encumbrance, security interest, lien, assignment, Claim, Interest, or other Cause of Action of any kind, nature or description (including, but not limited to, any claim of successor liability) that arose before the Confirmation Date, and any debt of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not a proof of claim is filed or is deemed filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim has voted on this Plan (including, without limitation, any liabilities arising under environmental laws in respect of the Debtor or any of the Debtor's successors or assigns or their respective Assets or properties, which result, in whole or in part, from any condition, event, occurrence or happening prior to the Confirmation Date, whether or not known or unknown, discovered or undiscovered, asserted or unasserted, latent or patent, and regardless of whether any Claim was, is or could have been asserted for such liability), and upon such discharge and release, no such liabilities shall be obligations, liabilities, claims, liens or encumbrances against the Reorganized Debtor, the Property and the Assets, whether under the doctrine of successor liability or otherwise.

2.      **Full Satisfaction**.

Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by this Plan, the Distributions and rights that are provided in this Plan will

25

be in complete satisfaction, discharge and release, effective as of the Effective Date of (i) all Claims and Causes of Action against, liabilities of, liens on, charges, encumbrances, security interests, obligations of and interests and Interests in the Debtor, if any, the Assets, or the direct or indirect Assets and properties of the Debtor, whether known or unknown and (ii) all Causes of Action, whether known or unknown, either directly or derivatively through the Debtor or the successors and assigns of the Debtor based on the same subject matter as any Claim, Interest or any other interests, in each case, regardless of whether a proof of Claim or Interest was filed, whether or not Allowed, and whether or not the holder of the Claim or Interest has voted on this Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Confirmation Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on this Plan.

3.    **Injunction Through Effective Date**.

All injunctions, liens or stays entered in the Reorganization Case and existing immediately before the Confirmation Date will remain in full force and effect until the Effective Date.

4.    **Permanent Injunction**.

Except as expressly provided for in this Plan, all Entities, including, but not limited to, the holders of any and all charges, debts, liens, assignments, liabilities, encumbrances, security interests, Claims, Interests, contingent or unliquidated, known or unknown, foreseen or unforeseen, existing or hereafter arising, or other Causes of Action (including any claims of successor liability), will be precluded and permanently enjoined from asserting against: (a) the Reorganized Debtor, and/or officers, members, directors, professionals and agents, (c) any successors and assigns of any of the foregoing and/or (d) the respective assets and property of any of the foregoing; any Claim or Interest based on any document, instrument, judgment, award, act, omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date. Such injunction will also preclude any act, in any manner, at any place whatsoever, that does not conform to or comply with the provisions of this Plan.

5.    **Binding Effect**.

As of the Effective Date, according to section 1141 of the Bankruptcy Code, the provisions of this Plan will bind the Reorganized Debtor, any entity acquiring Property and Operating Assets pursuant to a Plan Sale, any entity holding Property or Operating Assets to be acquired as part of a Plan Sale, and any holder of a Claim or an Interest, whether or not the Claim or Interest is Impaired under this Plan and whether or not the holder of the Claim or Interest has accepted this Plan.

6.    **Discharge and Release on Effective Date**.

On the Effective Date, the Reorganized Debtor shall be released and discharged from any and all Claims, whether now existing or hereafter arising, and held by any Entity, Creditor or party-in-interest, in any way related to the Debtor, the Assets, the Property, or the Operating Assets of the Debtor or this Reorganization Case.

**7.    Releases and Exculpation.**

(a)    As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor and the Reorganized Debtor, on its own behalf and as representative of and on behalf of the Estate, any and all Creditors, Residents, holders of any Claims or Interest or parties-in-interest (collectively in this Section, the "Releasing Parties") will be deemed to release forever, waive, and discharge the Released Parties (who are defined as the Debtor, the Foundation and each of the current officers, agents, Chapter 11 Professionals, advisors of the Debtor and the Foundation) from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen, or unforeseen, then exiting or thereafter arising, in law, equity, or otherwise, that the Releasing Parties, would have been legally entitled to asset in their own right against such Released Parties (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the estate, the Reorganization Case, this Plan or the Disclosure Statement, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interest in the Reorganization Case, the negotiation, formulation, or preparation of this Plan and the Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

(b)    Releases By and Among Released Parties.  As of the Effective Date, each Released Party shall and hereby does, for good and valuable consideration, including consideration for the obligations of the Debtor and the Reorganized Debtor under this Plan and the distributions to be delivered under this Plan, the adequacy of which is hereby confirmed, forever release, waive, and discharge the other Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen, or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that such Released Party would have been legally entitled to assert in its own right against such other Released Parties (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the estate, the Reorganization Case, this Plan, or the Disclosure Statement, the restructuring of Claims and Interests in the Reorganization Case, the negotiation, formulation, or preparation this Plan and the Disclosure Statement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that this

27

release shall not release any amounts owed to Released Parties by the Debtor as compensation (i.e., Allowed Professional Fees, etc.).

(c)  Injunction Related to Releases. The Confirmation Order will permanently enjoin the commencement or prosecution by any entity, including but not limited to the Releasing Parties, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released in this Section.

(d)  Special Provisions Regarding Releases. Notwithstanding anything in this Plan to the contrary, any person or entity may assert any claim released or purported to be released in this Plan as a defense or counterclaim (but no affirmative recovery may be obtained) to any suit or action that (i) is commenced by a person or entity that grants or that was purported to be deemed to have granted a release under this Plan and (ii) asserts a claim or cause of action released or purported to be released under this Plan.

(e)  Exculpation. Neither the  Debtor, the Reorganized Debtor, nor any of their respective officers, directors, employees, attorneys, representatives, financial advisors, investment bankers, advisors or agents, in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, or arising out of, the Reorganization Case, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan.  The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Exculpated Parties.  Each of the Exculpated Parties shall have the right to independently seek enforcement of this release provision.   The rights granted hereunder are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.  This exculpation from liability provision is an integral part of this Plan and is essential to its implementation.

## VII.   RESERVATION AND SETTLEMENT OF CLAIMS

### 1.   General Provision.

All claims under sections 544, 547, 548, and 549, 550, 551, 553 and 554 of the Bankruptcy Code, are and shall be extinguished as of the Effective Date; provided, however, that any such claims are reserved and may be used by the Reorganized Debtor  for defensive purposes with respect to any Claims.

### 2.   Release by Debtor of Chapter 5 Causes of Action.

28

(a)        Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, for valuable consideration, the receipt and sufficiency of which is acknowledged, and without which the Plan could not be confirmed and consummated, on the Effective Date, and without any further documentation, the Debtor and the Reorganized Debtor shall be conclusively and irrevocably deemed to have released, canceled and compromised, any and all claims and causes of action in favor of, or exercisable by the Debtor (including rights and causes of action which a trustee would have the right to bring on behalf of the bankruptcy estate), and/or the Reorganized Debtor, including, without limitation, all claims under sections 544, 547, 548, and 549, 550, 551, 553 and 554 of the Bankruptcy Code and/or similar claims arising under state or any other law, including claims in the nature of fraudulent transfer, successor liability, veil piercing, or alter-ego type claims (collectively, "Chapter 5 Claims").

**3.        Reservation of Causes of Action.**

Except to the extent such rights, claims, Causes of Action, defenses, and counterclaims are expressly and specifically released in connection with the Plan, the Confirmation Order or any settlement agreement approved during the Bankruptcy Case, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code: (1) any and all rights, claims, Causes of Action, defenses, and counterclaims of, or accruing to, the Debtor or its Estate shall be retained by and vest in the Reorganized Debtor whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, Causes of Action, defenses and counterclaims have been listed or referred to in the Plan, the Schedules, or any other document filed with the Bankruptcy Court, and (2) the Reorganized Debtor does not waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, claim, Cause of Action, defense, or counterclaim that constitutes property of the Estate: (a) whether or not such right, claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Plan or the Schedules, or any other document filed with the Bankruptcy Court, (b) whether or not such right, claim, Cause of Action, defense, or counterclaim is currently known to the Debtor, and (c) whether or not a party in any litigation relating to such right, claim, cause of action, defense or counterclaim filed a proof of Claim in the Bankruptcy Case, filed a notice of appearance or any other pleading or notice in the Bankruptcy Case, voted for or against the Plan, or received or retained any consideration under the Plan.  Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principal of law or equity, without limitation, any principals of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, THE FAILURE TO LIST, DISCLOSE, DESCRIBE, IDENTIFY, OR REFER TO A RIGHT, CLAIM, CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, OR POTENTIAL RIGHT, CLAIM, CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, IN THE PLAN, THE SCHEDULES, OR ANY OTHER DOCUMENT FILED WITH THE BANKRUPTCY COURT SHALL IN NO MANNER WAIVE, ELIMINATE, MODIFY, RELEASE, OR ALTER ANY RIGHT OF THE DEBTORS, THE REORGANIZED DEBTOR TO COMMENCE, PROSECUTE, DEFEND AGAINST, SETTLE, AND REALIZE UPON ANY RIGHTS, CLAIMS, CAUSES OF ACTION, DEFENSES, OR COUNTERCLAIMS THAT THE DEBTOR, THE REORGANIZED DEBTOR, AS APPLICABLE, HAVE, OR MAY HAVE, AS OF THE EFFECTIVE DATE.

4.      **Retention of Subsequent Causes of Action.**

Except as is otherwise expressly provided herein or in the Confirmation Order, nothing in this Plan or the Confirmation Order shall preclude or estop the Debtor, the Reorganized Debtor, or their privies, as successors in interest to the Debtor and its privies, from bringing a subsequent action in any court or adjudicative body of competent jurisdiction, to enforce any or all of its or their rights in connection with the Causes of Action, irrespective of the identity of any interest, cause of action, or nexus of fact, issues or events which is now or which could have been asserted in these Bankruptcy Case, the present litigation, and those which may be asserted in any subsequent litigation brought by any interested party.  Moreover, the failure to commence any of the foregoing Causes of Action prior to the Confirmation Date shall not constitute res judicata, judicial or collateral estoppel with respect to any such Cause of Action.

5.      **Indemnification of Directors and Officers.**

The Reorganized Debtor shall indemnify, to the fullest extent possible under the Reorganized Debtor's constituent documents and applicable non-bankruptcy law, any person serving as a director or officer of the Reorganized Debtor for any action or omission of such person as a director or officer of the Debtor, regardless of whether such act or omission occurred prior to or after the Petition Date, and such indemnification obligations of the Debtor and the Reorganized Debtor shall be deemed assumed for purposes of this Plan.

VIII.   **PROCEDURE FOR RESOLVING DISPUTED CLAIMS, ADMINISTRATIVE CLAIMS, AND IN RESPECT OF DISTRIBUTIONS**

1.      **Objection Deadline.**

As soon as practicable, but in no event later than twenty-eight (28) days after the Effective Date, unless extended by the Reorganized Debtor in its sole discretion by the filing of a notice with the Court, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

2.      **Authority to Oppose Claims.**

On and after the Effective Date, the objecting to, disputing, defending against, and otherwise opposing, and the making, asserting, filing, litigation, settlement or withdrawal of all objections to, Claims shall be the exclusive responsibility of the Reorganized Debtor.  The Reorganized Debtor shall have the power, without notice to or approval of the Bankruptcy Court, in the exercise of its business judgment to preserve, fail to preserve, settle, compromise or litigate any claim or cause of action (except for any claims or causes of action released or to be released pursuant to or in connection with this Plan) before any applicable or appropriate court, panel, agency or tribunal (including, where appropriate, the Bankruptcy Court) that the Debtor may have against any Person based on acts, omissions or events prior to the Effective Date.

3.        **No Distributions Pending Allowance.**

Notwithstanding any other provision in this Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a Disputed Claim unless and until such Claim becomes an Allowed Claim.

4.        **Surrender of Cancelled Securities.**

All Series 2001 Bonds will be deemed cancelled automatically and of no further force and effect upon the issuance of the Series 2014 Bonds.  The holders of the Series 2001 Bonds shall tender such instruments, securities, or other document to the Indenture Trustee, who, upon receipt, shall cancel all instruments and securities evidencing the Series 2001 Bonds and return them to the Reorganized Debtor.

5.        **Determination by Bankruptcy Court.**

The amount of any Disputed Claim, and the rights of the holder of such Claim, if any, to payment in respect thereof shall be determined by the Bankruptcy Court, unless it shall have sooner become an Allowed Claim.

6.        **Administrative Claims Bar Date and Objections.**

All Administrative Claims required to be filed shall be filed by the Administrative Claims Bar Date, and if not filed by such time, shall be deemed to be forever waived and barred.  Any objections to Administrative Claims must be filed within fourteen (14) days after the Administrative Claims Bar Date in order to be timely, and otherwise such objections shall be forever waived and barred.  The Reorganized Debtor, in its sole discretion, may extend the Administrative Claims Bar Date and/or the objection deadline in its sole discretion by the filing of a notice with the Court.

7.        **Treatment of Disputed Claims.**

Cash shall be distributed by the Debtor to a holder of a Disputed Administrative Expense Claim or Disputed Claim when, and to the extent that, such Disputed Administrative Expense Claim or Disputed Claim becomes an Allowed Administrative Expense Claim or Allowed Claim pursuant to a Final Order.  Such distribution shall be made in accordance with this Plan to the holder of such Claim based upon the amount in which such Disputed Administrative Expense Claim or Disputed Claim becomes an Allowed Administrative Expense Claim or Allowed Claim, as the case may be.

8.        **Insurance Claims.**

For any claims that are covered by insurance, no distributions shall be made on account of Allowed Claims until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtor's Insurance Policies.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurer's agreement, such Claim may be expunged

31

without a Claims objection having to be filed and without any further notice to or action, or approval of the Bankruptcy Court.

### 9.    Distributions.

The Reorganized Debtor or its designee shall be the Disbursing Agent pursuant to this Plan.  Distributions with regard to the Class 4 Series 2001 Bond Claim shall be made by the Debtor to the Indenture Trustee, pursuant to, as appropriate, the terms of the Series 2001 Bond Documents or the Series 2014 Bond Documents. All distributions on account of the Series 2001 Bond Claim will be subject to any charging lien of the Indenture Trustee under the Series 2001 Bond Documents, and the Series 2014 Bond Documents shall contain provision for a similar charging lien.

### 10.    Unclaimed Distributions.

Other than Distributions for the Class 4 Series 2001 Bond Claim which shall be made via the Indenture Trustee, the Debtor shall pay Distributions to the last known address of any holder, pursuant to the address on any Proof of Claim filed or, if none, then the address on the Debtor's schedules filed in the Bankruptcy Case (and if redacted for privacy purposes, to the address used by the Debtor's Voting Agent on any protected matrix). Any Distributions that remain unclaimed (including uncashed or returned to Debtor) after one (1) year from their issuance shall become the property of the Reorganized Debtor, and the Claims with respect to which those Distributions are made shall be automatically cancelled, discharged, and forever barred.

### 11.    No Distributions in Excess of Allowed Claim.

Notwithstanding anything in the Plan to the contrary, no holder of an Allowed Claim shall receive in respect of the Claim any Distribution in excess of the Allowed Amount of the Claim.

### 12.    Setoff and Recoupment.

The Reorganized Debtor may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that the Debtor, the estate, or the Reorganized Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the estate, or the Reorganized Debtor of any claim or right to setoff or recoupment that any of them may have against the holder of any Claim.

### IX.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption or Rejection of Executory Contracts and Unexpired Leases.

As of the Effective Date, all executory contracts and unexpired leases that exist between any Debtor and any Entity, including but not limited to the Residency Contracts, are hereby assumed, except for any executory contract or unexpired lease (i) which has been rejected

32

pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date, or (ii) as to which a motion for approval of the rejection of such contract has been filed prior to and is pending on the Confirmation Date. Subject to the occurrence of the Effective Date, the rejection of any executory contract or unexpired lease pursuant to this Article shall be effective upon the earliest of the Confirmation Date, the date on which the Debtor notifies the non-debtor party to such contract or lease of the effectiveness of such rejection, and the date specified as the effective date of rejection in any order of the Bankruptcy Court.

Entry of the Confirmation Order shall constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption or assumption and (upon a Plan Sale) assignment of the executory contracts and unexpired leases assumed pursuant to Sections 7.1(a), (b) and (c) hereof, and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the terms of this Plan. Unless otherwise provided, the assumption of an executory contract or unexpired lease shall include all modifications, amendments, supplements, restatements or other agreements subservient or related thereto that in any manner affect such agreement, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan. Any executory contract or unexpired lease assumed as of the Effective Date shall continue to be subject to assignment pursuant to section 365 of the Bankruptcy Code in the event of a Plan Sale.

For the avoidance of doubt, the Debtor shall assume all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption (and, if necessary in Debtor's discretion upon a Plan Sale, assignment) of each of the Insurance Policies. For the avoidance of doubt, the Debtor shall also assume its Medicare and Medicaid provider agreements and provider numbers as of the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption.

All cure payments which may be required by section 365(b)(1) of the Bankruptcy Code under any executory contract or unexpired lease which is assumed under this Plan shall be made by the Debtor on the Effective Date or as soon as practicable thereafter. All requests for cure payments by a party to such assumed contract or lease, and objections to the cure payment set out in the Plan Supplement, must be filed by the date for objections to Confirmation, unless such cure payments are agreed to by the Debtor. In the event of a dispute regarding (i) the amount of any cure payment, (ii) the ability of the Debtor (or the winning Bidder in the event of a Plan Sale) to provide adequate assurance of future performance, or (iii) any other matter pertaining to assumption (other than matters conclusively determined by this Plan), the Debtor shall make such cure payments required by section 365(b)(1) of the Bankruptcy Code following the later of the Effective Date (or as soon as practicable thereafter) and the date of the entry of a Final Order resolving such dispute. Assumption of an executory contract or unexpired lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any

33

assumed executory contract or unexpired lease at any time prior to the effective date of assumption (or assignment, in the event of a Plan Sale).

**2.      Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Plan.**

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to this Plan must be filed with the Bankruptcy Court no later than twenty-eight (28) days after entry of the Confirmation Order.  Any Claims not filed within such time will be forever barred from assertion against the Debtor, its estate, and its property.

**3.      Reservation of Rights.**

Neither the inclusion or exclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor or the Reorganized Debtor that any such contract or lease is in fact an executory contract or unexpired lease, and the Debtor and Reorganized Debtor's rights shall be preserved to contest whether an obligation is an executory contract or unexpired lease.

## X.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The tax consequences, if any, to creditors of the Debtor are so specific to the individual creditor that creditors are urged to contact their own tax advisors for such information. As to the Debtor, there should not be any income tax consequence on the Debtor from the Plan as the Debtor is a not-for-profit entity generally exempt from income taxation. As noted above, a condition to the Effective Date of the Plan is the issuance by bond counsel of an opinion that the interest on the Series 2014 Bonds will be excluded from gross income for federal tax purposes.

## XI.      LIQUIDATION ANALYSIS UNDER CHAPTER 7

Under the Bankruptcy Code, in order for a plan to be confirmed, each creditor must receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Attached hereto as **Exhibit D-3** is the Debtor's Liquidation Analysis.

Pursuant to the Debtor's liquidation analysis, the Debtor believes that recoveries under a Chapter 7 liquidation scenario would be lower than proposed by the Plan for a variety of reasons. First, the appraised value of the Community is significantly less than what RTE is willing to pay in order to attempt to keep the property and maximize the value for all stakeholders.  Second, the sale of the Community without a minimum price set by the Plan, and in a more compressed timeframe due to a lack of DIP funding by a trustee unfamiliar with the Facility, will most likely result in lower sale value than the Debtor will receive under the terms of the Plan. Third, the conversion of the case to Chapter 7 liquidation would necessitate the payment of fees to the Chapter 7 Trustee, and attorneys, accountants and other professionals retained by the Chapter 7 Trustee, for disposition of the assets.  These fees directly reduce any recovery otherwise available to creditors. Because of these factors, the Debtor believes that the funds available for

34

distribution to all creditors, including the bondholders, would be significantly less than that proposed by the Plan.

Accordingly, each holder of a Claim will receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

## XII.    CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

## A.    VOTING AND OTHER PROCEDURES.

A Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan. Each holder of a Claim or Interest in Classes 4 and 7 shall be entitled to vote to accept or reject the Plan.

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes of claims that are impaired under the terms and provisions of a Chapter 11 plan and are to receive distributions thereunder are entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims and interests will not receive or retain any property under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims or interests are Unimpaired under a Chapter 11 plan are deemed to have accepted the plan and also are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) claims, as acceptance by creditors actually voting in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims; and (ii) Interests, as acceptance by interest holders in that class actually voting that hold at least two-thirds in number of the shares of the common stock of a debtor.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or otherwise in accordance with the provisions of the Bankruptcy Code.

With respect to the Plan, any holder of a Claim in an Impaired Class (i) whose Claim has been listed by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), or (ii) who filed a proof of claim on or before the applicable bar date (or, if not filed by such date, any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim has not been disallowed and is not the subject of an objection, is entitled to vote. Holders of Claims that are disputed, contingent and/or unliquidated are entitled to vote their Claims only to the extent that such Claims are Allowed for the purpose of voting pursuant to an order of the Bankruptcy Court. The Debtor may seek a determination that any Class of Claims

35

that is entitled to vote to accept or reject the Debtor's Plan that does not vote to accept or reject the Debtor's Plan be deemed to accept the Plan, as applicable.

After carefully reviewing this Disclosure Statement, including any exhibits, each holder of an Allowed Claim entitled to vote may vote whether to accept or reject the Debtor's Plan.  If you are entitled to vote on the Plan, a Ballot for voting accompanies this Disclosure Statement. If you hold a Claim, please vote and return your Ballot to the Voting Agent as follows, whether by U.S. mail, overnight courier, or by hand delivery:

> GLOBIC ADVISORS
> 880 THIRD AVENUE, 12TH FLOOR
> NEW YORK, NEW YORK  10022

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.  BALLOTS RETURNED TO THE VOTING AGENT BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS WILL NOT BE COUNTED.

> **THE VOTING DEADLINE IS
> 5:00 P.M., EASTERN
> TIME ZONE, ON
> SEPTEMBER ____, 2014.**

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.  ALL CREDITORS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

**Ballots must be *received* by the Voting Agent by the Voting Deadline.**  If a Ballot is received after the Voting Deadline, it will not be counted.  Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail, overnight courier or personal delivery to the Voting Agent at the address set forth above.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

ANY OBJECTIONS TO THE CONFIRMATION OF THE PLAN MUST BE FILED IN ACCORDANCE WITH AND NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

If you are entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please telephone the Voting Agent at the following telephone number: **212-227-9699.**

## B.    DISCLAIMERS AND ENDORSEMENTS

This Disclosure Statement contains information about the Debtor's Plan. Holders of Claims are urged to study the text of the Plan carefully to determine the impact of the Plan on their Claims and to consult with their financial, tax and legal advisors.

Nothing contained in this Disclosure Statement or the Plan will be deemed an admission or statement against interest that can be used against the Debtor in any pending or future litigation. Any reference to creditors or Claims in this Disclosure Statement is not an admission with respect to the existence, ownership, validity, priority, or extent of any alleged Lien, Claim, interest, or encumbrance.

Certain statements and assertions in this Disclosure Statement may be subject to dispute by parties in interest.

## C.    THE CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing with respect to the Plan. The Confirmation Hearing in respect of the Plan has been scheduled for the date and time set forth in the accompanying order before the Honorable_____, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Indiana, _____Division, _____. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing or posted at the courthouse at the Confirmation Hearing or at an adjournment thereof. Any objection to confirmation (i) must be made in writing, (ii) must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest in the Debtor held by the objector, and (iii) must be timely made. Any such objections must be filed with the Bankruptcy Court pursuant to its Case Management/Electronic Case Filing

procedures, and served so that they are received by the following counsel, on or before the date and time set forth in the accompanying notice:

**Counsel to the Debtor**:

Jeffrey A. Hokanson, Esq.
Frost Brown Todd LLC
201 N. Illinois Street
Suite 1900
Indianapolis, Indiana 46204

-and-

Bobby Guy, Esq.
Robin Bickett White, Esq.
Frost Brown Todd LLC
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1900
Nashville, TN 37201

-and-

Ronald E. Gold, Esq.
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202-4182

## D.  CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired Classes of Claims or, if rejected by an Impaired Class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of creditors that are Impaired under the Plan.

## E.  UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS

Under the Bankruptcy Code, a plan does not have to be accepted by every class of creditors or interest holders to be confirmed.  If a class of claims rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to Section 1129(b) of the Bankruptcy Code the so-called "cramdown" provision of the Bankruptcy Code.  Section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims and interests.  Under that section, a plan

38

may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class, and meets the other legal criteria for confirmation.

In the event that any Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, and/or (b) modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

Accordingly, to obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cram down" tests for Classes of Secured Claims, Unsecured Claims and Interests that do not accept the plan, as follows:

    **1.**    **Secured Creditors**

Either (a) each Impaired Secured creditor retains the Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments (x) totaling at least the Allowed Amount of the Secured Claim and (y) having a present value at least equal to the value of the Secured creditor's collateral, (b) each Impaired Secured creditor realizes the "indubitable equivalent" of its Allowed Secured Claim, or (c) the property securing the Claim is sold free and clear of Liens with the Secured creditor's Lien to attach to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (a) or (b) of this subparagraph.

    **2.**    **Unsecured Creditors**

Either (a) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the plan, and the "best interest" test is met so that each Impaired unsecured creditor recovers at least what that creditor would receive if the case was converted to a chapter 7 case.

    **3.**    **Holders of Interests**

Either (a) each holder of Impaired Interests receives or retains under the plan property of a value equal to the greatest of the Allowed Amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (b) no holder of junior interests receives or retains any property, and the "best interest" test is met, so that each Impaired Interest holder recovers at least what that Membership Interest holder would receive if the case was converted to a chapter 7 case.

    **4.**    **No Unfair Discrimination**

In addition, the "cram down" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the claims of any impaired, non-accepting class. While the "unfair discrimination" determination depends upon the particular facts of a case and the nature of the claims at issue, in general, courts have interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the debtor of equal or junior status.

All Classes of Claims will receive distributions under the Plan; thus, no Classes of Claims are conclusively presumed to have rejected the Plan.  The Debtor believes that the treatment of all Classes of Claims under the Plan satisfies the "no unfair discrimination" requirement for nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code.  With respect to each such Impaired, non-accepting Class, there is no Class of equal priority receiving more favorable treatment under the Plan, and no Class that is junior to such Impaired, non-accepting Class will receive or retain any property under the Plan on account of the Claims or Interests in such Class

## F.    FEASIBILITY

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the debtor is provided for in the plan.  It is not likely that the confirmation will be followed by liquidation or the need for further financial reorganization of RTE. Financial projections demonstrating the pro forma financial results of the Reorganized Debtor are attached as **Exhibit D-4** ("Financial Projections").  RTE prepared the Financial Projections and made certain reasonable assumptions in these Financial Projections, which are set forth in the Financial Projections.

## G.    BEST INTEREST TEST

In order to confirm a plan of reorganization, the Bankruptcy Court must determine that the plan is in the best interests of all classes of creditors and equity security holders impaired under that plan. The "best interest" test requires that the Bankruptcy Court find that the plan provides to each member of each impaired class of claims and interests (unless each such member has accepted the plan) a recovery which has a value at least equal to the value of the distribution that each creditor or interest holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

The Debtor requests confirmation of the Plan over the rejection of any Classes.  In so doing, the Debtor seeks to establish that the Plan complies with the best interest of creditors test with respect to any such Class or Classes, and satisfy all other legal criteria for confirmation.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis contained in this Disclosure Statement, the Debtor believes that the Plan provides to each holder of a Claim and Interest holder a value at least equal to the value of the distribution that each holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

40

## H.    CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.    THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND THE IMPLEMENTATION OF THE PLAN.

### 1.    Risk of Liquidation of the Debtor's Estate

If the Plan is not confirmed and consummated, there can be no assurance that the Debtor's Chapter 11 Case will continue as chapter 11 reorganization case rather than be converted to liquidation, or that any alternative plan of reorganization would be on terms as favorable or more favorable to holders of Claims as the terms of the Plan.  If a liquidation or different reorganization were to occur, the distributions to certain holders of Allowed Claims may be reduced, or possibly completely eliminated.  As previously noted, the Debtor believes that in a liquidation under chapter 7, additional administrative expenses of a chapter 7 trustee and such trustee's attorneys, accountants, and other professionals, would cause a diminution in the value of the Debtor's Estate.  In addition, certain additional Claims may arise in a chapter 7 liquidation and from the rejection of unexpired leases and other executory contracts in connection with any cessation of the Debtor's operations.  As described above, this might negatively impact the amount of distributions under the Plan, if any, to holders of Allowed Claims.  As a result of these circumstances, the Debtor believes that the Plan provides a significantly higher return to holders of Claims against the Debtor, as compared to liquidation.

### 2.    Risk of Non-Occurrence of the Effective Date

The occurrence of the Effective Date in the Plan is conditioned upon the happening of certain events.  There can be no assurance that all of these events will occur or that those that do not occur will be waived.  Accordingly, even if the Plan is confirmed, there can be no assurance that the Effective Date will occur.

### 3.    Uncertainty Regarding Objections to Claims

The Plan provides that certain objections to Claims can be filed with the Bankruptcy Court after the Effective Date.  A creditor may not know that its Claim will be objected to until after the Effective Date.

### 4.    Revenue Assumptions

Management's financial forecast contained in Exhibit D-4 hereto is based upon certain assumptions. There may be differences between the forecasted and actual results, and those differences may be material. While the forecasts represent management's best estimate, the forecasts are not a guarantee of any future performance or events, and are fully qualified in all

41

respects as forward-looking statements. No representation or assurance is given or can be made that revenues will be realized by the Debtor in amounts sufficient to pay debt service on the Series 2014 Bonds when due and other payments necessary to meet the obligations of the Debtor.

5.       **Regulatory and Healthcare Industry Risks**

The Debtor will be subject to regulation, certification, and reimbursement by various federal, state and local government agencies. No assurance can be given as to the effect on future operations of the Debtor of existing laws, regulations, standards for certification, and reimbursement rules or schedules, or of any future changes in any of the foregoing. In addition, the healthcare industry is undergoing a period of rapid change, including competition, shifting reimbursement structures, staffing shortages, tort law reform, and a strict regulatory enforcement environment. There can be no assurances that these and similar factors will not affect the Debtor's performance under the Plan.

6.       **Possible Changes in Tax Status.**

The possible modification or repeal of certain existing federal income or state tax laws or other loss by the Debtor of the present advantages of certain provisions of the federal income or state tax laws could materially and adversely affect the status of the Debtor and thereby the revenues of the Debtor, and could materially and adversely affect the tax treatment of interest on the Series 2014 Bonds. The Debtor is an exempt organization under Section 501(c)(3) of the Tax Code. As an exempt organization, the Debtor is subject to a number of requirements affecting its operations. The failure of the Debtor to remain qualified as an exempt organization would affect the funds available for payments to be made under the Series 2014 Bond Documents. Moreover, the Internal Revenue Service has many tools, including the assertion of an "excise tax" that may be used as an alternative for revocation of federal tax exempt status of an organization that violates IRS private inurement regulations. Failure of the Debtor or the Issuer to comply with certain requirements of the Code, the assessment of penalties related thereto or adoption of amendments to the Code affecting the tax-exemption of bonds such as the Series 2013 Bonds could cause interest on the Series 2013 Bonds to be included in the gross income of owners or former owners for federal income tax purposes.

It is not possible to predict the scope or effect of future legislative or regulatory actions with respect to taxation of nonprofit corporations. There can be, however, no assurance that future changes in the laws and regulations of the federal, state or local governments will not materially and adversely affect the operations and revenues of the Debtor by requiring them to pay income or real estate taxes.

7.       **Tax-Exempt Status of the Series 2014 Bonds.**

As a condition to effectiveness of the Plan, bond counsel will be required to issue an opinion that the interest on the Series 2014 Bonds will be excluded from gross income for federal income tax purpose. Nevertheless, the tax-exempt status of the Series 2014 Bonds is based on the continued compliance by the Issuer, the Debtor and users of property financed or refinanced with

42

proceeds of the Series 2014 Bonds with certain federal tax law requirements relating, among other items, to restrictions on the ownership and use of the facilities financed or refinanced with the proceeds of the Series 2014 Bonds, arbitrage limitations and rebate of certain excess investment earnings to the federal government. The Series 2014 Bonds are considered a single issue of bonds for purposes of determining compliance with such requirements. The Reorganized Debtor will covenant to comply with such requirements. Failure to comply with such requirements could cause interest on all Series 2014 Bonds to become subject to federal income taxation retroactive to the date of issue of the Series 2014 Bonds. The Series 2014 Bonds are subject to redemption upon a Determination of Taxability as defined in the Series 2014 Bond Indenture, and interest thereon is subject to increase to a Gross-up Rate if such redemption does not occur within 150 days of a Determination of Taxability, but there is no assurance that payment will be made by the Reorganized Debtor or otherwise available in such event to provide any or full compensation to holders of Series 2014 Bonds for any taxes, interest or penalty that may become payable by such holders in the event of the taxability of interest on the Series 2014 Bonds

### 8. Lack of Marketability for the Series 2014 Bonds.

There can be no assurance that there will be a secondary market for the Series 2014 Bonds, and the absence of such a market for the Series 2014 Bonds could result in investors not being able to resell the Series 2014 Bonds should they need to or wish to do so.

### 9. Possible Limitations on Security.

The enforceability of the liens of the Series 2014 Bond Documents, and in particular the enforceability of the security interest in the Debtor's accounts and general intangibles, may be limited by a number of factors, including without limitation: (i) provisions prohibiting the direct payment of amounts due to health care providers from Medicaid and Medicare programs to persons other than such providers; (ii) the absence of an express provision permitting assignment of receivables owed to the Debtor under its contracts, and present or future prohibitions against assignment contained in any applicable statutes or regulations; (iii) certain judicial decisions which cast doubt upon the right of the Indenture Trustee, in the event of the bankruptcy of the Debtor, to collect and retain accounts receivable from Medicare, Medicaid and other governmental programs; (iv) commingling of proceeds of accounts and general intangibles with other moneys of the Debtor not subject to the security interest in accounts and general Intangibles; (v) statutory liens; (vi) rights arising in favor of the United States of America or any agency thereof; (vii) constructive trusts, equitable or other rights impressed or conferred by a federal or state court in the exercise of its equitable jurisdiction; (viii) federal bankruptcy laws or state insolvency laws which may affect the enforceability of the Series 2014 Bond Documents or the security interest in the accounts and general intangibles of the Debtor which are earned by the Debtor within 90 days preceding or, in certain circumstances with respect to related corporations, within one year preceding and after any effectual institution of bankruptcy or insolvency proceedings by or against the Debtor; (ix) rights of third parties in accounts and general intangibles converted to cash and not in the possession of the Indenture Trustee; and (x) claims that might arise if appropriate financing or continuation statements are not filed in accordance

43

with the Uniform Commercial Codes of the state in which the Debtor is organized as from time to time in effect.

**10.    Environmental Matters.**

Health care providers are subject to a wide variety of federal, state and local environmental and occupational health and safety laws and regulations which address, among other things, health care operations, facilities and properties owned or operated by health care providers. In its role as the owner and operator of properties or facilities, the Debtor may be subject to liability for investigating and remedying any hazardous substances that may have migrated off of its property.  There is no assurance that the Debtor will not encounter such risks in the future, and such risks may result in material adverse consequences to the operations or financial condition of the Debtor.

**NOTWITHSTANDING THE FOREGOING RISK FACTORS, THE DEBTOR BELIEVES THAT THE PLAN IS FEASIBLE, LIKELY WILL NOT BE FOLLOWED BY THE NEED FOR FURTHER RESTRUCTURING OR LIQUIDATION AND PRESENTS THE BEST VEHICLE FOR THE DEBTOR, ITS CREDITORS AND OTHER PARTIES IN INTEREST.**

## XIII.    CONCLUSION AND RECOMMENDATION

RTE believes that confirmation and implementation of the Plan is preferable to any alternative that is realistically available under the present circumstances.  In addition, any other alternative would involve significant delay, litigation, uncertainty, substantial additional administrative costs, and may result in the Debtor's liquidation. RTE urges holders of Impaired Claims to vote in favor of the Plan.

**[signatures on next page]**

0127241.0608061   4826-2605-2124v10

Dated: July 22, 2014

DISCLOSURE STATEMENT FILED BY:

**RIVER TERRACE ESTATES, INC.**

By: _____

Its: _CEO_____